No. 69,477

STATE OF KANSAS, *Appellee*, v. DERRICK D. DAVIS, *Appellant*.
(883 P.2d 735)

2

Opinion filed October 28, 1994.

*Jessica R. Kunen*, chief appellate defender, argued the cause and was on the brief for appellant.

*Michael A. Russell*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by Derrick Davis following his convictions and sentencing for nine counts of aggravated robbery. He was sentenced to a controlling term of 45 years to life. His claims of error include exclusion of evidence, admission of evidence, denial of his right to confront witnesses, limitation of cross-examination, failure to give instructions on lesser offenses, and improper sentencing.

The charges arose from four separate incidents in Wyandotte County. Davis substantially admitted that he was involved in each incident. He denied having played a major role in the incidents and contended he was coerced into participating because his co-defendants made threats to harm him or his family.

The following is a summary of what occurred with the facts set forth most favorably to the prevailing party, as we are required to do. More facts will be added as the individual issues are considered.

A white Ford Explorer was taken from its owner in an armed robbery by three black males displaying handguns. That robbery is not involved here, and the victim was unable to identify the persons who committed the robbery. The white Ford Explorer figured in three of the four robberies that followed.

The first incident occurred at a "Shop-n-Go" store. Three black males, two of them wearing ski masks and all of them armed with handguns, robbed the store clerk and a customer. They left in a white Ford Explorer.

The next series of robberies occurred at a Hardee's restaurant. There were five victims. Three black males, all wearing ski masks and all armed with and displaying handguns, participated. One shot was fired and the perpetrators left in a white Ford Explorer.

The next event occurred at a Best Western motel, and two women were robbed. Three black males drove up in a white Ford Explorer. Two of them exited the Explorer. One robbed Dorothy Eberhard and took her car keys, her purse, her tote bag, and her car. The other male, identified as Davis by both victims, put a handgun to Amanda Radley's head and took her purse and car.

The last incident occurred outside Wyandotte High School. Three black males driving Eberhard's stolen car stopped two Wy-

andotte High School students. Two of the males in the stolen Eberhard vehicle exited the car, and one of them broke a victim's nose and stole his jacket. Davis was identified as pointing a gun at the second victim and taking that victim's L.A. Kings starter jacket.

Several hours after the Wyandotte High School incident, following a car and foot chase, Davis was arrested. A gun, identified by several victims as resembling the gun used to rob them, was discovered in an abandoned house nearby. The .25 caliber Raven handgun had one round of ammunition in the chamber and six in the magazine. Elbert Roddy, a codefendant in the Wyandotte High School incident, testified that Davis threw the gun during the foot chase. When apprehended, Davis was wearing the Wyandotte High School victim's black L.A. Kings jacket, which had four .25 caliber cartridges in a pocket.

Davis gave several statements to the police admitting his involvement in each of the incidents. These statements were read to the jury at trial. Davis admitted that Gregory Wells and Robert Thomas picked him up in the white Ford Explorer and took him to the "Shop-n-Go" but claimed he did not know the others planned to rob the store until the robbery was announced. He did admit that he had a chrome .25 caliber automatic gun in his hand and that he remained in the middle of the store wearing his Miami Hurricanes jacket inside out during the robbery.

Davis claimed that several days after the Shop-n-Go incident, Wells and Thomas again picked him up in the Explorer and took him to Hardee's, where the three put on ski masks and he was told they were going to rob the restaurant. Davis had a chrome .25 caliber handgun and again turned his green Miami Hurricanes jacket inside out before going into the store. The others were also armed. Davis admitted that after one of the others took a woman's purse, it was handed to him and that two of the employees who were robbed gave their wallets to him.

Davis also admitted in his statement to police that he was involved in the Best Western incident with Wells and Thomas and that he had a .25 caliber automatic weapon in his pocket. He denied pointing his gun at the victim's head. He claimed that he drove the Explorer from the scene.

Regarding the Wyandotte High School incident, Davis denied that he knew the automobile he was riding in was stolen. Elbert Roddy spotted a jacket he wanted, and Roddy, Davis, and Wells exited the car. Roddy fought with a man in an Atlanta Hawks starter jacket and obtained the jacket. Davis denied having a gun, but stated he put his hand in his pocket "[t]o fake like I had a gun or somethin'," and he took the other victim's jacket.

Roddy testified that Davis pulled a gun and took a jacket. Roddy indicated that the gun was the one Davis usually carried.

At trial, Davis denied he had a gun at the Shop-n-Go robbery. He denied displaying his gun at Hardee's, although he admitted he had a gun in his pocket. He denied taking an active role in the Best Western incident altogether. He claimed he remained in the Explorer and only drove it away because otherwise he would have been stranded. He denied pretending to have a gun in the Wyandotte High School incident. He insisted that he did not even ask the victim for his jacket but that the victim just took the jacket off and handed it to Davis.

Davis also raised the defense of compulsion at trial. He claimed he was threatened that the people he was with would drive by his house and "shoot whoever's in there." He insisted he would not have committed any of the crimes but for the fear or compulsion of Wells, Thomas, and Roddy. He did admit that he did not tell anyone about the threats before his arrest, nor did he mention these threats in any of his statements to the police after his arrest.

The trial court instructed the jury on Davis' defense of compulsion. The jury convicted Davis of nine counts of aggravated robbery. Five of those counts arose out of the Hardee's incident, two counts out of the Best Western incident, and two counts out of the Wyandotte High School incident. Davis was acquitted of two counts in the Shop-n-Go incident. He was sentenced to 15 years to life on each of the nine counts. The sentences on three of the counts were imposed consecutively and the remainder concurrently for a controlling term of 45 years to life.

## EXCLUSION OF EVIDENCE

At trial, Davis sought to introduce testimony concerning threats

made by Robert Thomas toward Davis' family after Davis was arrested. Defense counsel proffered that the testimony would show Thomas went to the Davis home and had an argument or dispute and made some threats to Davis' family concerning Davis' testimony. Defense counsel further proffered that while Davis was at his uncle's house during a brief release from jail, Thomas parked in front of the house and made threatening gestures.

The State objected to testimony concerning threats made after Davis was arrested, and the trial court sustained the objection, finding that such testimony was not relevant to the defense of compulsion. Davis was permitted to testify about threats made to him during the time the actual robberies were occurring. He contends that excluding the evidence of subsequent threats was erroneous.

The standard of review is whether the trial court abused its discretion in excluding the proffered evidence. The rules governing admission of evidence are well established.

"The primary test of admissibility of evidence is its relevancy to the issue in question. Relevancy is more a matter of logic and experience than of law. Evidence is relevant if it renders the desired inference more probable than it would be without the evidence or if it has any tendency in reason to prove any material fact." *State v. Vaughn*, 254 Kan. 191, Syl. ¶ 5, 865 P.2d 207 (1993).

See K.S.A. 60-401(b); *State v. Friberg*, 252 Kan. 141, 147, 843 P.2d 218 (1992). Admission or exclusion of evidence rests within the sound discretion of the trial judge, subject to exclusionary rules. *Friberg*, 252 Kan. 141, Syl. ¶ 5. See *Vaughn*, 254 Kan. at 204; *State v. Tran*, 252 Kan. 494, Syl. ¶ 5, 847 P.2d 680 (1993).

Davis contends that the proffered evidence was relevant to his defense of compulsion. The defense of compulsion is set forth in K.S.A. 21-3209:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

The test of compulsion has been stated:

> "In order to constitute the defense of compulsion, the coercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The doctrine of coercion or duress cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm. *State v. Milum*, 213 Kan. 581, 582, 516 P.2d 984 (1973). In addition, the compulsion must be continuous and there must be no reasonable opportunity to escape the compulsion without committing the crime. *State v. Myers*, 233 Kan. 611, 664 P.2d 834 (1983)." *State v. Hunter*, 241 Kan. 629, Syl. ¶ 10, 740 P.2d 559 (1987).

See *State v. Scott*, 250 Kan. 350, Syl. ¶ 5, 827 P.2d 733 (1992).

The trial court instructed the jury that compulsion was a defense to the crimes charged. The instruction given substantially followed K.S.A. 21-3209(1) but did not include subsection (2) of that statute.

Davis recognizes two elements to the compulsion defense. First, the criminal activity must be induced by a threat of imminent, though not immediate, harm. Second, the defendant must reasonably believe the harm will occur if he or she does not comply. Davis does not suggest that the evidence of threats subsequent to his arrest shows that he was compelled at the time of the offenses. Rather, he argues that the subsequent threats reveal a pattern of threats and corroborate his testimony that threats were made at the time of the offenses. Davis also argues that the subsequent threats show the reasonableness of his belief that harm was imminent.

The State argues that evidence of subsequent threats was not relevant and cites *State v. Hunter*, 241 Kan. 629. In *Hunter*, the defendant sought to sever his trial from that of a codefendant, Dunn. Dunn had successfully filed a motion in limine to exclude evidence of prior crimes she was alleged to have committed with another codefendant, Remeta. Hunter argued that excluding evidence of Dunn's prior crimes also excluded evidence of charges pending in five states for crimes allegedly committed by Remeta and Dunn and statements made by Remeta and Dunn concerning these crimes. Hunter sought to assert a defense of compulsion based on his fear of Remeta, and he argued that his defense was

prejudiced by exclusion of the evidence of prior crimes. This court held the fact that Remeta was subsequently charged with other offenses was not relevant to Hunter's defense of compulsion; rather, only Remeta's description of his prior crimes was relevant to explain the reasonableness of Hunter's fear of Remeta. 241 Kan. at 634.

The *Hunter* court stated: "Evidence of events subsequent to an arrest is generally not relevant to show that an individual was compelled to commit the prior criminal acts." 241 Kan. at 634. Davis distinguishes *Hunter* and argues that here, the subsequent threats were made by the same people Davis claimed compelled him to commit the crimes, whereas in *Hunter* it was the codefendant's subsequent arrest that was not relevant, not subsequent threats the codefendant had made.

Davis also points out that in *State v. Irons*, 250 Kan. 302, 827 P.2d 722 (1992), events subsequent to the offense were relevant. In *Irons*, the defendant raised the compulsion defense to a charge of aggravated escape from custody. The elements of the compulsion defense in escape cases differ somewhat from those in other offenses. Five conditions must be met:

"(1) The prisoner is faced with a threat of imminent infliction of death or great bodily harm; (2) there is no time for complaint to the authorities or there exists a history of futile complaints which makes any result from such complaints illusory; (3) there is no time or opportunity to resort to the courts; (4) there is no evidence of force or violence used towards prison personnel or other 'innocent' persons in the escape; and (5) the prisoner immediately reports to the proper authorities when he or she has attained a position of safety from the imminent threat." 250 Kan. 302, Syl. ¶ 1.

At issue in *Irons* was whether the defendant reported to the proper authorities upon reaching a position of safety. Irons was an inmate in a work release facility. He was threatened while at the facility and upon his release to go to work. Two inmates told Irons they would kill him when he returned to the facility. 250 Kan. at 304. When he arrived at work, Irons called the judge who sentenced him, who suggested he call the work release facility. Irons did so and spoke with the assistant administrator, who told him to return and that he could be transferred in a week, but Irons did not feel he could safely return. Irons called the facility

again that evening to speak with the assistant administrator, but he was not there. At that time, Irons was directed to return to the facility by 7:00 the next morning. At 7:00 a.m., 8:00 a.m., and 10:00 a.m., Irons called the facility to speak to the assistant administrator, but he again was not there. At the time of the last call, Irons was informed that escape charges had been filed. Irons was arrested five months later in Texas. 250 Kan. at 304-05. This court held that Irons' subsequent calls satisfied the requirement that the defendant report to the authorities upon reaching a place of safety. Irons reported the threats, but was unable to return to the facility when the authorities offered him no viable alternative. 250 Kan. at 309.

Davis reasons, "If evidence of Irons' attempts to contact the authorities after his escape was relevant to a jury's determination of whether he was compelled to escape, it follows that evidence of a codefendant's threats toward Derrick and his family after commission of the crimes, was relevant to a jury's determination of whether he reasonably believed he was compelled to commit the crimes charged and whether the threats were imminent." What Davis misinterprets is the nature of the subsequent events. In aggravated escape cases such as *Irons*, the subsequent behavior of the defendant in reporting to authorities upon reaching safety is an element of the compulsion defense; that is the relevance of the subsequent events. Likewise, in a case such as *Irons*, subsequent threats would be relevant to show the point at which the defendant had reached safety. In this case, an aggravated robbery case, the subsequent activities of the defendant are not elements of the compulsion defense; there is no requirement that the defendant report to the authorities upon reaching safety.

Davis also likens the compulsion defense to the defense of self-defense. He points out that self-defense involves both a subjective test to determine whether the defendant sincerely and honestly believed it was necessary to kill and an objective standard to determine whether the defendant's belief was reasonable. Davis suggests that the proffered evidence of subsequent threats was relevant both to the subjective standard of whether he believed that harm would occur and to the objective standard of whether his

belief was reasonable. He argues that the subsequent threats were relevant to the jury's determination that harm was imminent. Davis also posits that the threats were relevant to explain that he did not tell the police he was compelled to commit the crimes because he was still afraid of his codefendants.

Davis sets forth several other arguments. He points out that in *State v. Cramer*, 17 Kan. App. 2d 623, 627, 841 P.2d 1111 (1992), *rev. denied* 252 Kan. 1093 (1993), the Court of Appeals held that evidence of aggression by the defendant against third parties in instances unrelated to the crime charged was admissible to rebut the defendant's claim that she suffered from battered woman syndrome and believed she was in imminent danger. Davis asserts that evidence of incidents corroborating his theory concerning the codefendants' behavior is admissible, especially since the incidents are related to the crime charged. Davis also points out that in *State v. Thomas*, 252 Kan. 564, 579, 847 P.2d 1219 (1993), this court found threats the defendant had made against a witness to be relevant because " 'attempts by the accused to conceal or destroy evidence, or to fabricate or procure false evidence, are incriminating circumstances that may be presented to the jury.' " Davis reasons that threats made by Robert Thomas here were likewise relevant because the threats support Davis' claim that Thomas threatened him and portray Thomas as the ringleader and therefore incriminate Thomas. However, while the subsequent threats would be relevant in Thomas' trial based on *Thomas*, this evidence was not relevant in Davis' trial.

Davis also argues that the subsequent threats are admissible as part of the res gestae because the evidence corroborates his belief that if he did not participate in the crimes, he or his family would be harmed. "Those acts done or declarations made before, during or after the happening of the principal occurrence may be admitted as part of the res gestae where those acts or declarations are so closely connected with the principal occurrence as to form in reality a part of the occurrence." *State v. Peterson*, 236 Kan. 821, Syl. ¶ 1, 696 P.2d 387 (1985). Davis' proffer concerning the subsequent threats was that the threats were about Davis' testimony. Such evidence is not so closely connected with Davis'

claim that he was threatened at the time of the crimes that it constitutes part of the res gestae.

Davis also points out that motions in limine may not be used to choke off a valid defense in a criminal action and that the right to present one's theory of defense is absolute. See *Irons*, 250 Kan. at 309. However, the right to present a defense "is subject to statutory rules and case law interpretation of rules of evidence and procedure." *Thomas*, 252 Kan. at 573. Davis was permitted to present his theory of defense. He testified extensively about the threats made during each of the four robberies, and the jury was permitted to consider the defense of compulsion with respect to each of the incidents. Excluding evidence of subsequent threats did not interfere with Davis' right to present his defense when such evidence was not relevant.

The trial court's decision excluding the proffered evidence of subsequent threats Thomas made to Davis and his family will be reversed only for an abuse of discretion.

"Judicial discretion is abused if judicial action is arbitrary, fanciful, or unreasonable. Stated another way, discretion is abused only if no reasonable person would take the view adopted by the trial court. If reasonable persons could differ regarding the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *State v. Brown*, 249 Kan. 698, Syl. ¶ 10, 823 P.2d 190 (1991).

Davis has not shown that the trial court abused its discretion by excluding this evidence. The evidence was not relevant to Davis' defense of compulsion because the evidence concerned events occurring subsequent to the crimes charged. While the subsequent threats may make more probable the inference that Davis believed Wells, Thomas, and Roddy would harm him if he did not participate, reasonable minds could differ as to whether the evidence was relevant. This court will not substitute its judgment for that of the trial court where the trial court used its discretion in excluding the evidence.

Moreover, K.S.A. 21-3209(2) precludes use of the compulsion defense by "one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat." Though this language was not included in the

instruction given to the jury, it was applicable and should have been included. A strong argument could be made that the compulsion defense was not available to Davis as to the Hardee's, Best Western, and Wyandotte High School incidents because Davis placed himself in a position where it was probable that he would be subjected to compulsion or threat. *Cf. State v. Crawford*, 253 Kan. 629, 641, 861 P.2d 791 (1993). In *Crawford*, this court approved including in a jury instruction on the defense of compulsion the following language: "The compulsion or coercion . . . must be continuous, and there must be no reasonable opportunity to escape the compulsion without committing the crime. A threat of future injury is not enough, particularly after danger from the threat has passed." 253 Kan. at 635-36.

According to Davis, he did not know Wells, Thomas, and Roddy until shortly before the first robbery occurred. He testified he only participated in that robbery because of the threats made. The jury acquitted Davis of that robbery. However, Davis was not in the continuous presence of his codefendants during the period between each of the incidents. Thus, Davis had an opportunity to escape the compulsion by not rejoining Wells and Thomas when they picked him up before the Hardee's and the Best Western incidents and by not joining Wells when he picked Davis up before the Wyandotte High School incident. Davis made a decision to continue to associate with Wells and Thomas despite his knowledge that they were likely to engage in criminal behavior and that it was probable he would be called upon to participate.

In *State v. Harrison*, 228 Kan. 558, 618 P.2d 827 (1980), the defendant raised the defense of compulsion to a charge of aggravated robbery. She sought to introduce evidence that on the night of the robbery, another person produced a gun and told her he would use the weapon on her unless she committed the offense in question. The defendant also proffered that she was fearful for her own life and the lives of her children if she did not comply. Further, the defendant's counsel stated that the person who made the threat actually received the proceeds from the robbery. 228 Kan. at 559. The trial court held that the proffer was insufficient as a matter of law to sustain the defense of com-

pulsion because imminent danger was not established. 228 Kan. at 559. This court agreed and stated:

"[T]he defendant, having been threatened by Heath, left his house in her own car, drove away, and committed the robbery. There was nothing to prevent her from driving to the police authorities to report the threats made to her. The vague reference to her children is not sufficient to show that there was a present, imminent, and impending threat of direct or serious bodily injury to either herself or her children." 228 Kan. at 560.

Likewise, there was nothing preventing Davis from going to the police after the Shop-n-Go incident and reporting the robbery and the threats made to him and his family. Having participated in the Shop-n-Go incident, Davis and his family were no longer in danger of imminent harm. At the most, harm would be some time in the future if Wells, Thomas, and Roddy discovered that Davis had gone to the police. However, Davis did not go to the police, and he did not even tell the police he was compelled at the time of his arrest. Instead, Davis voluntarily joined Wells, Thomas, and Roddy in the commission of the three subsequent robberies. The defense of compulsion is not intended to excuse criminal conduct when the defendant continues to subject himself to participating in such conduct. "The Judicial Council's comment to K.S.A. 21-3209(2) specifies that '[s]ubsection (2) creates an exception for the person who connects himself with criminal activities or is otherwise indifferent to known risk.' " *State v. Scott*, 250 Kan. at 358. Although the trial court did not limit the defense of compulsion to the Shop-n-Go incident, doing so would not have been error because the trial court could have found the evidence insufficient as a matter of law to sustain the defense of compulsion with respect to the Hardee's, Best Western, and Wyandotte High School incidents.

Although we hold the trial court did not abuse its discretion in excluding the proffered evidence, reversal is not required even if the exclusion were an abuse of discretion. "Errors which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining do not require reversal when substantial justice has been done." *State v. Bell*, 239 Kan. 229, 235, 718 P.2d 628 (1986). Davis has failed to show that the

exclusion of this evidence prejudicially affected his substantial rights. Davis was permitted to testify concerning the threats made by Wells, Thomas, and Roddy at the time the crimes occurred. He was thoroughly able to present his defense of compulsion, and the jury was permitted to consider the defense with respect to all counts charged.

## CROSS-EXAMINATION OF RODDY

Elbert Roddy testified for the State. He admitted he was involved in the Wyandotte High School incident and was responsible for breaking a victim's nose. He stated that he pleaded guilty to one count of simple robbery based on that incident and a second charge of aggravated robbery was dismissed. Roddy testified that he was sentenced to 3 to 10 years' imprisonment for the robbery offense and to a consecutive term of 3 to 10 years for an (unrelated) indecent liberties conviction. A journal entry in the record reflects that the sentences imposed were consecutive to sentences imposed in two unrelated cases in 1989 and 1990. Roddy denied that any promises had been made to him concerning his testimony against Davis, although he did admit that he hoped for favorable treatment on a motion to modify his sentences. Roddy was not involved in the other armed robberies that are the subject of this appeal.

Davis' trial counsel attempted to cross-examine Roddy concerning other contact with the criminal justice system. Counsel indicated he was not using the evidence for truth or dishonesty but rather for how it would affect sentencing "because it has to run consecutive to the time he's got." Defense counsel asked counsel for the State what prior record Roddy had, and the State indicated Roddy was on parole for aggravated assault. Defense counsel argued that "the issue of what deal he got is relevant . . . [a]nd if he hadn't had his probation revoked, I think that's very relevant." Counsel stated, "I think it completely prejudices my client's rights if I can't get in—in other words there may be part of this deal that we don't know about that we can't get in front of the jury." The trial court noted that the evidence the defense sought was total speculation and sustained the State's

objection to the line of questioning. Davis contends this ruling was error.

At the outset it must be noted that there was no proffer as to what the testimony would be concerning Roddy's status on probation or parole. Defense counsel sought to make a proffer at the time of the ruling, and the trial court agreed that defense counsel could do so later. However, the record before this court does not reveal the proffer. "An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, a reviewing court presumes that the action of the trial court was proper. *State v. Gonzales*, 245 Kan. 691, 699, 783 P.2d 1239 (1989)." *State v. Richard*, 252 Kan. 872, 874, 850 P.2d 844 (1993). Without a proffer, the defendant is unable to show that reversible error occurred.

Davis argues that exposing Roddy's motivation for testifying to avoid revocation was a proper area of cross-examination. "The exposure of a witness' motivation in testifying is a proper and important function of cross-examination." *State v. Bowen*, 254 Kan. 618, Syl. ¶ 6, 867 P.2d 1024 (1994).

This court thoroughly discussed cross-examination of a witness concerning the witness' status on probation in *Bowen*. There, an eyewitness identified the defendant as having committed the crime. The defendant sought to cross-examine the witness concerning her status on probation for an unrelated possession of cocaine charge, which the trial court denied. The State pointed out that the witness was not a suspect in the crime and therefore was not subject to having probation revoked. The *Bowen* court held that the defendant should have been permitted to cross-examine the witness concerning her status on probation. The *Bowen* court then went on to hold that the error in excluding Bowen's proposed cross-examination of the witness was harmless, noting that the witness' testimony was corroborated by several other witnesses and that the witness was asked whether she was given anything in exchange for her testimony. 254 Kan. at 630.

The *Bowen* court's holding that excluding a defendant's cross-examination of a witness concerning his or her motivation or bias

constitutes error was premised on *Davis v. Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974). In *Davis*, the defendant was precluded by a protective order from cross-examining a witness concerning a juvenile adjudication. The defendant reasoned that the witness may have identified the defendant out of fear or concern of possible jeopardy to his probation and to shift suspicion away from himself as the one who committed the crime. The United States Supreme Court stated, "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' [Citation omitted.]" 415 U.S. at 316. The Court reversed the defendant's conviction and granted a new trial.

In *Bowen*, this court followed *Davis*. However, in holding the error harmless, the *Bowen* court observed:

> "*Davis* endorses a defendant's right to cross-examine a witness to expose bias and prejudice. However, the Court's emphasis on the critical nature of [the witness'] testimony suggests that if testimony is not necessary for conviction, its restriction will not constitute a denial of effective cross-examination." 254 Kan. at 629.

The *Bowen* court also recognized that the United States Supreme Court itself has interpreted *Davis* as not establishing a categorical exception to the harmless error rule, citing *Delaware v. Van Arsdall*, 475 U.S. 673, 682-83, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986). 254 Kan. at 630.

In *Van Arsdall*, the Court stressed that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one. [Citations omitted.]" 475 U.S. at 681. The Court held that the harmless error analysis applies to the improper denial of a defendant's opportunity to impeach a witness for bias. 475 U.S. at 684. The Court pointed out a variety of factors to be considered in the harmless error analysis, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. [Citations omitted.]" 475 U.S. at 684.

*Davis, Van Arsdall,* and *Bowen* make it clear that the trial court here should have permitted Davis to question Roddy about his status on probation or parole and the possible motivation he may have had to testify based on that status. However, if the error was harmless, reversal is not required. The harmless error standard of review requires us to declare beyond a reasonable doubt that the error had little, if any, likelihood of changing the result at trial. *Bowen,* 254 Kan. at 630.

Davis argues that the error was not harmless. He asserts that Roddy's testimony portrayed Davis as "flashing" his gun and the money after the Shop-n-Go and Hardee's incidents. Davis also notes Roddy testified that Davis usually carried a gun. Further, Roddy's testimony indicated that Davis threw his gun in the woods during the foot chase just prior to his arrest. Davis reasons that Roddy's testimony was the only evidence contradicting Davis' defense of compulsion. He points out that, unlike the witness in *Bowen,* Roddy was in jeopardy of having his probation or parole revoked based on his conviction in the Wyandotte High School incident.

The State, conversely, argues that the error was harmless. The State asserts that Davis' theory that Roddy hoped for favorable treatment should he be faced with probation or parole revocation is speculative. The State reasons that Roddy had no notice at the time of his testimony that Davis would rely on a defense of compulsion and that other witnesses disputed Davis' defense of compulsion, including Davis' own statements to police which failed to mention that he was compelled. Moreover, much of Roddy's testimony was corroborated by other witnesses.

The error here was harmless. Davis was not completely precluded from establishing Roddy's motivation or bias. Rather, he was permitted to thoroughly question Roddy concerning his hoped-for favorable treatment at his sentence modification hearing on the Wyandotte High School incident. Thus, the jury was presented with evidence concerning Roddy's possible motivation or bias. Moreover, the jury was instructed to consider the testimony of an accomplice with caution. Roddy's testimony was corroborated by other witnesses. Three victims positively identified

Davis as participating in the crimes. All of the witnesses testified that Davis displayed a gun, and Davis himself admitted in his statements to the police that he possessed a gun during all except the Wyandotte High School incident, when he pretended to have one. Roddy's testimony that Davis displayed a weapon and money after the Shop-n-Go and Hardee's incidents was not corroborated. However, the jury acquitted Davis of the Shop-n-Go robbery. Davis was more than adequately permitted to expose Roddy's possible bias or motive in testifying to place his testimony in proper perspective. The error had little, if any, likelihood of changing the result at trial.

## THE FORD EXPLORER

Davis next contends that the trial court erred in admitting evidence that the white Ford Explorer used in three of the four robberies was stolen. The Explorer was identified by witnesses in the Shop-n-Go, Hardee's, and Best Western incidents. Testimony revealed that the Explorer was taken from Patrick Prendergast on November 6, 1991, by three unidentified black men displaying guns. At least one of the men wore a ski mask. Davis admits that Prendergast testified he had not identified any individuals as having committed the robbery. When he recovered the Explorer, Prendergast discovered in the vehicle property which did not belong to him, including property identified as belonging to one of the victims of the Hardee's robbery as well as spent shell casings and live ammunition.

Davis sought prior to trial to exclude evidence of the theft of the Explorer. However, the record on this matter is sketchy. On March 19, 1992, the State filed a motion to determine admissibility of res gestae act, or in the alternative, notice of intent to present evidence of crime or civil wrong on a specified occasion. The motion refers to actions and statements made on November 6, 1991, near Prendergast's address. The trial court agreed to hear the motion. Davis' appellate counsel attempted to have the record of a March 20, 1992, hearing transcribed. However, on the request for the March 20, 1992, transcript is a note showing that no record of the hearing was made. Further, the court reporter

indicates in two letters that at a March 19, 1992, hearing there was a tentative setting for another hearing, which never came about unless the March 20, 1992, date is counted, and that no record was taken of the March 20, 1992, hearing.

There is no journal entry in the record concerning the court's ruling on the State's motion. At trial, Davis objected to the evidence. Defense counsel stated:

"Your Honor, the court has previously ruled on the state's motion to introduce evidence of some other uncharged crimes or prior—of other prior acts. And I've already objected strongly to that. But for the record I just want to make sure that I have that objection preserved, and I'm renewing that objection. . . . I want to make sure I'm reasserting the exact objection."

The trial court responded, "That's a continuing objection throughout the course of trial." The lack of a record of argument on the issue and of the court's ruling prevents this court from knowing exactly what objection Davis asserted and exactly what the court's ruling was.

However, the transcript of hearing on Davis' motion for a new trial suggests that the basis for admitting the evidence was indeed that it constituted part of the res gestae of the crimes charged. No limiting instruction was given. Had the evidence been admitted pursuant to K.S.A. 60-455, a limiting instruction should have been given. See *State v. Peterson*, 236 Kan. 821, Syl. ¶ 2. At the hearing on Davis' motion for a new trial, defense counsel argued that the theft of the automobile was not res gestae. The State pointed out that there was a long pretrial hearing on the issue and both sides were given ample opportunity to argue the issue; additionally, defense counsel supplied a brief on the issue to the court. Counsel for the State opined that "the court made the proper ruling in that case as far as whether or not the evidence as to the Ford Explorer and to the tag were res gestae."

The lack of a record concerning the grounds on which Davis objected to evidence of the theft of the Ford Explorer and the court's ruling on the objection is fatal to Davis' claim of error. "An appellant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred in the trial court. In the absence of such a record, a reviewing court presumes that

the action of the trial court was proper. *State v. Gonzales,* 245 Kan. 691, 699, 783 P.2d 1239 (1989)." *State v. Richard,* 252 Kan. at 874. "[A] defendant cannot object to the introduction of evidence on one ground at trial and then assert a different objection on appeal." *State v. Skelton,* 247 Kan. 34, 44, 795 P.2d 349 (1990). Davis has not shown the grounds on which he objected to the evidence at trial, nor has he affirmatively shown the basis on which the trial court admitted the evidence.

In any event, the trial court did not err in admitting evidence of the theft of the Explorer. Davis argues that the admission of the evidence prejudiced his right to a fair trial and denied him his right to fundamental fairness. He discusses *State v. Bowman,* 252 Kan. 883, 850 P.2d 236 (1993), and states that in *Bowman,* prior crimes of a defense witness were admissible to show the witness' bias, interest, or improper motive in testifying, to show the social relationship between the defendant and the witness, and as part of the res gestae of the crime. Davis reasons that in the case at bar, evidence of the theft of the Explorer was not relevant to show the relationship of the parties or to demonstrate the witness' bias, nor was it part of the res gestae. Rather, the sole effect of the evidence was to prejudice the jury against him.

In *Bowman,* the trial court admitted evidence that the defendant's girlfriend, a witness for the defendant at trial, was convicted of obstructing the legal process after she attempted to smuggle bullets to the defendant in jail. This court held:

"Evidence that has a direct bearing on, and a relation to, the commission of an offense is admissible without a limiting instruction and is not rendered inadmissible because it may disclose other or independent offenses."

"The law allows the admission of evidence as part of the res gestae of acts made before, during, or after the principal event." *Bowman,* 252 Kan. 883, Syl. ¶¶ 2, 5.

The State argues that evidence of the theft of the Explorer was relevant because the vehicle was used in three of the incidents. The State reasons that the vehicle was used to conceal who committed the crimes and to avoid apprehension. Moreover, the evidence of the Explorer served to connect the robberies. The testimony of Patrick Prendergast was necessary to establish that

property found in the vehicle did not belong to him and was not in the vehicle before it was stolen. The State cites *State v. McDaniel & Owens*, 228 Kan. 172, 612 P.2d 1231 (1980).

This court's opinion in *McDaniel & Owens* is on point. In *McDaniel & Owens*, the victim of an aggravated robbery reported the license tag number on the vehicle used in the robbery. The State sought to introduce evidence that the license tag had been stolen from Mrs. Rogers during the night preceding the robbery. The defendants argued that evidence the tag was stolen was not relevant and contended on appeal that the trial court erroneously admitted the evidence. This court recognized:

> "On its face, Mrs. Rogers' testimony is evidence of a crime committed by some person(s). In conjunction with other testimony, the clear inference is that the appellants stole the license tag. That evidence could have created an inference that the appellants were disposed to commit the robbery. K.S.A. 60-455 prohibits admission of such evidence unless it is relevant to prove one of eight specific factors. But, in certain instances, Kansas case law permits admission of such evidence independent of 60-455. Acts done or declarations made before, during or after the happening of the principal occurrence may be admissible as part of the *res gestae* where the acts are so closely connected with it as to form in reality a part of the occurrence. [Citations omitted.]" 228 Kan. at 176.

After discussing examples of res gestae, this court held that the theft of the license tag was so closely related in time to the robbery that it was part of the occurrence and was admissible as part of the res gestae. Evidence of the tag's origin was relevant to further explain all of the circumstances surrounding the aggravated robbery. The vehicle, borrowed from the girlfriend of one of the defendants, did not have a license tag at the time it was borrowed. The court opined that placing the stolen tag on the car served to conceal who committed the crime and that without the stolen tag on the vehicle, it was likely to draw the attention of police. 228 Kan. at 177.

Just as this court recognized in *McDaniel & Owens*, evidence in the case at bar that the Explorer was stolen is evidence of a crime committed by some person or persons. In fact, Prendergast testified that the vehicle was stolen by three black men displaying guns. This description matches that given by the victims of the

Shop-n-Go, Hardee's, and Best Western incidents. The clear inference is that Wells, Thomas, and Davis stole the vehicle, although Prendergast testified that he never identified the individuals who took his vehicle.

As in *McDaniel & Owens*, evidence that the Ford Explorer used in three of the incidents was stolen constituted part of the res gestae and was properly admitted. The Explorer was stolen the day before the first aggravated robbery incident occurred. Davis himself admitted that the Explorer was used in the Shop-n-Go, Hardee's, and Best Western robberies, and property found in the vehicle when it was recovered was identified as belonging to one of the victims.

## LESSER INCLUDED OFFENSES OF ROBBERY AND THEFT

K.S.A. 21-3107(3) governs a trial court's duty to instruct the jury on lesser included offenses:

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced."

A trial court's affirmative duty to instruct on lesser included offenses exists notwithstanding a defendant's failure to request the instruction. *State v. Bowman*, 252 Kan. at 892. However, the duty "does not arise unless there is evidence supporting the lesser offense." *State v. Patterson*, 243 Kan. 262, 267, 755 P.2d 551 (1988). An instruction on a lesser included offense is required if there is substantial evidence upon which the defendant might reasonably have been convicted of the lesser offense. *State v. Mitchell*, 234 Kan. 185, 189, 672 P.2d 1 (1983). "Because reasonableness is an element of this test, there is some weighing of the evidence which occurs. . . . The weighing of evidence, however, is not a retrial of the case." *State v. Dixon*, 252 Kan. 39, 43, 843 P.2d 182 (1992). "The evidence, which must be viewed in the light most favorable to the defendant, may be inconclusive, unsatisfactory, and weak, and consist only of the defendant's testimony." *State v. Coleman*, 253 Kan. 335, 352, 856 P.2d 121 (1993). The evidence supporting

a lesser included offense may be introduced by either the State or the defendant. 253 Kan. at 354.

The crime of aggravated robbery is set forth in K.S.A. 21-3427: "Aggravated robbery is a robbery committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery." "Robbery is the taking of property from the person or presence of another by threat of bodily harm to his person . . . or by force." K.S.A. 21-3426. Theft is defined as

"any of the following acts done with intent to deprive the owner permanently of the possession, use or benefit of the owner's property:
  (a) Obtaining or exerting unauthorized control over property; or
  (b) Obtaining by deception control over property; or
  (c) Obtaining by threat control over property; or
  (d) Obtaining control over stolen property knowing the property to have been stolen by another." K.S.A. 21-3701.

Davis asserts that he was entitled to jury instructions on robbery and on theft under subsections (a), (c), and (d) as lesser included offenses of the aggravated robbery offenses with which he was charged. Robbery is clearly a lesser included offense of aggravated robbery. However, not all methods of theft are lesser included offenses of robbery.

In *State v. Long*, 234 Kan. 580, 675 P.2d 832 (1984), *overruled on other grounds State v. Keeler*, 238 Kan. 356, 365, 710 P.2d 1279 (1985), this court held that theft is an included crime of robbery. The method of theft in question there was under subsection (a) of K.S.A. 21-3701, obtaining or exerting unauthorized control over property.

Davis acknowledges that lesser included instructions are not required if the evidence at trial excludes a theory of guilt of the lesser offense. *State v. Sutherland*, 248 Kan. 96, Syl. ¶ 2, 804 P.2d 970 (1991). He argues, however, that the evidence at trial does not exclude a finding of guilt of lesser included offenses. Davis recognizes that he admitted he was present during the offenses, but he stresses that he denied possessing or displaying a gun. He reasons that because he was charged as a principal, the fact that his codefendants possessed and displayed guns should not preclude the jury from deciding the full extent of his participation.

The State argues that the fact Davis was charged as a principal does not preclude a finding of guilt as an aider and abettor. Davis' defense was that he was not a willing participant, not that some lesser crime was actually committed. The State cites *State v. Goering*, 225 Kan. 755, 594 P.2d 194 (1979). In *Goering*, this court held that a person who aids or abets in the commission of any offense may be charged, tried, and convicted in the same manner as if he were a principal. 225 Kan. 755, Syl. ¶ 4. *Cf. State v. Johnson & Underwood*, 230 Kan. 309, 311, 634 P.2d 1095 (1981).

In *State v. Whitaker*, 255 Kan. 118, 872 P.2d 278 (1994), the defendant was charged with aggravated robbery. He claimed he was unarmed and asserted the defense of compulsion. It was uncontroverted that a codefendant was armed. The defendant argued that his defense of compulsion did not preclude giving an instruction on the lesser included offense of robbery. This court disagreed and reasoned as follows:

"[T]here were only two versions of what occurred. Whitaker either actively participated in an armed robbery, or he was compelled by the armed robber to participate out of fear for his own safety. If Whitaker's compulsion defense is believed, he is not guilty of a crime. If the compulsion defense is rejected and [the victims] are believed, the only possible verdict is that aggravated robbery occurred with Whitaker acting either as a principal or as an aider and abettor to [the codefendant]. There was no duty to instruct on the lesser offense of robbery because the evidence clearly shows that a greater offense, aggravated robbery, occurred. [Citation omitted.] The trial court was not required to instruct on the lesser included offense of robbery." 255 Kan. at 129-30.

Davis contends that instructions on robbery and different methods of theft should have been given based on the evidence of each incident. He reasons that the facts of each incident support various lesser included offenses.

We have carefully examined the evidence of each of the incidents and find Davis either actively participated in the crime of aggravated robbery or was compelled to participate out of fear for his own or his family's safety. Thus, he was either guilty of aggravated robbery or he was guilty of no crime at all. His argument that a broken nose does not constitute bodily harm is incorrect. In *State v. Hammond*, 251 Kan. 501, 507, 837 P.2d 816 (1992), this court found that a broken nose satisfied the bodily harm element of the crime of aggravated kidnapping.

The only other issue that requires comment in this regard is Davis' argument that at the Wyandotte High School incident he did not display a gun and did not demand the victim's jacket. If Davis' testimony that the victim voluntarily gave Davis his jacket without any prompting from Davis is believed, then there was no crime at all. The only other version of the facts shows aggravated robbery. We hold that the trial court did not err in not giving an instruction on robbery and theft.

## SENTENCING

Davis' final claim on appeal is that the trial court abused its discretion in sentencing him to a controlling term of 45 years to life imprisonment and in failing to modify the sentence. Davis' argument is three-fold. First, the trial court failed to consider K.S.A. 21-4601 and K.S.A. 21-4606 in sentencing him and K.S.A. 21-4601 in refusing to modify his sentence. Second, the trial court failed to state with particularity its reasons for not modifying Davis' sentence despite a recommendation for modification by the Topeka Correctional Facility (TCF). Third, the trial court failed to consider the sentences imposed on the codefendants and erred in imposing a disparate sentence on Davis and in failing to modify his sentence.

### K.S.A. 21-4601 and K.S.A. 21-4606

There are certain factors which must be considered by a sentencing judge in order to properly exercise sentencing discretion. The sentence imposed must be individualized to the defendant considering the needs of public safety and the welfare of the defendant in light of his or her "individual characteristics, circumstances, needs, and potentialities." K.S.A. 21-4601. Further, "K.S.A. 21-4606(2) sets forth seven factors which, while not controlling, are to be considered by the court in fixing the minimum term of imprisonment which is consistent with the public safety, the needs of the defendant, and the seriousness of the defendant's crime." *State v. McDonald*, 250 Kan. 73, Syl. ¶ 5, 824 P.2d 941 (1992). The criteria include

"(a) The defendant's history of prior criminal activity;
(b) The extent of the harm caused by the defendant's criminal conduct;

(c) Whether the defendant intended that his criminal conduct would cause or threaten serious harm;

(d) The degree of the defendant's provocation;

(e) Whether there were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;

(f) Whether the victim of the defendant's criminal conduct induced or facilitated its commission;

(g) Whether the defendant has compensated or will compensate the victim of his criminal conduct for the damage or injury that he sustained." K.S.A. 21-4606(2).

When a sentencing judge imposes a sentence greater than the minimum, the judge should make on the record a detailed statement of the facts and factors considered by the court. "Such a record would be of great assistance to the appellate courts in determining whether the sentencing court has abused its discretion." *State v. Buckner*, 223 Kan. 138, Syl. ¶ 9, 574 P.2d 918 (1977). See *State v. Richard*, 252 Kan. 872, 881, 850 P.2d 844 (1993); *McDonald*, 250 Kan. 73, Syl. ¶ 6. However, failure to make such a statement on the record does not necessarily indicate abuse of discretion in sentencing. Whether abuse occurred is to be determined on a case-by-case basis. *Richard*, 252 Kan. at 881. See *McDonald*, 250 Kan. 73, Syl. ¶ 6.

The standard for determining whether a sentencing judge abused his or her discretion in sentencing is as follows:

"One who asserts that the court has abused its discretion bears the burden of showing such abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. Stated another way, discretion is abused only where no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *State v. Heywood*, 245 Kan. 615, 621, 783 P.2d 890 (1989).

See *Taylor v. State*, 251 Kan. 272, Syl. ¶ 3, 834 P.2d 1325 (1992); *State v. Brown*, 249 Kan. 698, Syl. ¶ 10, 823 P.2d 190 (1991).

Davis argues that the court did not consider his age (18), his lack of a prior record, his stable family and community support, his low intelligence, his lack of substance abuse history, and his acquittal of the two counts involving the Shop-n-Go incident. Davis' trial counsel fully set forth these arguments to the trial court

at the time of sentencing, with the exceptions of noting Davis' low intelligence and his lack of substance abuse history.

In sentencing Davis, the trial court commented on Davis' young age and his lack of a prior record. The court stated:

"I'm not able at this time to overlook the facts of the circumstances of this case, and I would just say that over the years I've had many an opportunity to view the circumstances and fact situation[s] of a lot of heinous crimes, both from the bench and from the trial bar, and this—I think the word used by counsel for the state—that scary aptly describes the conduct of this defendant and the others that he was with."

The trial court noted the brazen nature of the offenses committed, that the offenses were committed on separate occasions, and that the defendants continued to drive the victims' cars around the city. The court also mentioned the lack of indication that the defendant was intoxicated or under the influence of drugs at the time of the offenses, even though such evidence would not be mitigating.

"And I think, again, the fact that it was as brazen as it is is extremely disturbing to all of the citizens of this community, and has to be dealt with severely. I have taken into consideration the matters to be considered by the court in determining the minimum sentence to be given to people convicted of felonies in this state, but my comments up to this point are most controlling in the sentence that I will be administering to this defendant, and personally make a finding at this time that I believe Mr. Davis is extremely dangerous. Other than the fact that pulling the trigger on his firearm during the commission of all these offenses, I can't imagine how he could have acted more dangerously than he did in these instances . . . ."

In sentencing Davis to the maximum period of incarceration, the court did not discuss K.S.A. 21-4606(2) factor by factor. However, the court's comments indicate consideration of the factors required by that statute. The court's comments relate to Davis' lack of prior criminal history (K.S.A. 21-4606[2][a]), the extent of harm caused (K.S.A. 21-4606[2][b]), whether Davis intended his actions to cause or threaten harm (K.S.A. 21-4606[2][c]) (the brazen nature of the offenses and the use of a gun), and the lack of grounds tending to excuse or justify the crime (K.S.A. 21-4606[2][e]). The court's comments do not specifically relate to the degree of his provocation (K.S.A. 21-4606[2][d]) or whether

the victims induced or facilitated the crimes (K.S.A. 21-4606[2][f]), nor did the court address whether Davis had compensated the victims (K.S.A. 21-4606[2][g]). The sentencing judge stressed that the use of a gun in the commission of these offenses was extremely dangerous. The only factors favorable to Davis were his young age and his lack of prior criminal history. While imposing a maximum sentence for a first-time offender may appear excessive, the sentencing judge thoroughly discussed the nature of the crimes and gave compelling reasons for imposing the maximum sentence.

Davis has not shown that the court failed to consider K.S.A. 21-4601 when it refused to modify his sentence. In fact, Davis really makes no mention of this argument distinct from the above analysis. K.S.A. 21-4601 states in part that "persons convicted of crime shall be dealt with in accordance with their individual characteristics, circumstances, needs, and potentialities . . . [and] that dangerous offenders shall be correctively treated in custody for long terms as needed." In refusing to modify Davis' sentence, the trial court mentioned the brazen nature of the offenses, commented that Davis was extremely dangerous and that the sentence was imposed to protect the community, and noted that Davis had a total disregard for the law. Further, Davis failed to take responsibility for his actions. In refusing to modify Davis' sentence, the court adequately considered Davis' individual needs as well as the safety of the community. The court did not fail to consider the mandate of K.S.A. 21-4601.

## TCF Recommendation to Modify

Davis also argues that the trial court failed to state with particularity the reasons for refusing to modify his sentence despite a recommendation for modification by TCF. K.S.A. 1993 Supp. 21-4603(d)(1) requires the district court to modify a defendant's sentence "if recommended by the Topeka correctional facility unless the court finds and sets forth with particularity the reasons for finding that the safety of members of the public will be jeopardized or that the welfare of the inmate will not be served by such modification." The TCF evaluation recommended that Davis

serve the appropriate sentence but concluded: "A sentence modification is recommended."

Davis contends that the court failed to comply with K.S.A. 1993 Supp. 21-4603(d)(1) because it failed to specify its findings with particularity. He asserts that the court only spoke of the nature of the crime and the fact that Davis used a weapon. Davis argues that the nature of the offense should not be relied upon exclusively in sentencing but that the trial court did so here. Davis argues "the use of a weapon in an offense which requires a weapon as an element of the crime, and lack of remorse or, in this case, failure to admit guilt, cannot be considered sufficient particular reasons for denying modification."

Davis also cites *State v. Huskey*, 17 Kan. App. 2d 237, 834 P.2d 1371 (1992), in which the Court of Appeals found that the district court failed to state with particularity the reasons for denying modification despite a TCF recommendation for modification. In *Huskey*, the district court stated:

" 'Well, as you know, this is a three-Judge Panel, and I'll be glad to give you my reasons, if you want me to, but I think, it's—I don't know that this is any different than a jury, but, I think, Mr.—as far as I'm concerned, his connection with the drug industry—and, this had to do with stolen antique guns.

" 'And, in the course of the investigation, there was a lot of uncovering of drugs.

" 'And the original panel didn't see fit to grant him probation.

" 'As far as I'm concerned, as a Member of this Panel, I don't think he is deserving of probation at this time.' " 17 Kan. App. 2d at 238.

The Court of Appeals found these comments insufficient to comply with the statutory requirement that the court state with particularity the reasons for denying modification despite the TCF recommendation. 17 Kan. App. 2d at 240.

Here, the court's reasons for refusing to follow the recommendation of TCF and modify Davis' sentence cover approximately eight pages of the transcript of the modification hearing. The court recognized its duty to give reasons with particularity if it did not follow the TCF recommendation. The court discussed in depth the details of Davis' crimes, noting the extent of danger in which Davis placed the victims because of his use of a gun

and that he could have pulled the trigger. The court also noted Davis' repeated denial of responsibility. The court stated:

"There isn't any question in my mind Derrick Davis is extremely dangerous. The sentence imposed in this case was imposed so that the members of this community are protected from people like him. . . . He was armed in every occasion, and as I said, I think the facts of this case indicate . . . the brazen attitude, the total disregard for the law and for the rights of any other people and their feelings . . . . And then, on top of all this, for this man to go to the people at [TCF] and to indicate to them that he was forced to commit all of these acts, that is incredible. I heard the evidence, and it's simply, simply is not so. The great weight of the evidence in this case was that he was just as much a mover as any of the rest of these people, and I can assure you that the testimony is overwhelming. [He] was not forced to do these things nor did he simply sit in the car while the rest of these hoodlums carried out all these activities. He was a main participant. He came, as I said before and I'll say it over again, within a fraction of an inch of a triggerpull of killing someone or more people, and people who are 18 can rob and kill and commit aggravated battery such as on the young man . . . at Wyandotte High School just as forcefully, just as competently as a person who's 25, 30 or 40 years old."

The court continued:

"But as I said before, my reasons for particularity are—in [particular] as far as this defendant is concerned, is the brazenness of his act, the total belief that I have that he is an extremely dangerous individual to the people of this community. . . . [T]hose factors and the factors of totally no remorse, and in fact continued statements by him that he is not responsible for these acts, that he didn't commit them, that he didn't participate in them willingly further indicates to me the state of mind of this young man. And [he] has no prior criminal record. To me, that is—is not a prerequisite. And as far as I'm concerned, in crimes of violence such as this, neither this defendant nor anybody else in this community's entitled to their first bite. His first bite was a big one, and as far as I'm concerned, he needs to pay for that."

The court set forth with sufficient particularity the reasons for finding that the public safety would be jeopardized or that the inmate's welfare would not be served by modification.

### Codefendants' Disparate Sentences

Davis also argues that the court failed to consider the shorter sentences imposed on his codefendants when it sentenced him to the maximum sentences.

Gregory Wells was charged with eleven counts of aggravated robbery, the same charges filed against Davis. In the Wyandotte

High School incident, Wells was charged with two counts of aggravated robbery; he pleaded guilty to an amended information of one count of simple robbery. He was charged with nine counts of aggravated robbery from the Shop-n-Go, Hardee's, and Best Western incidents; he pleaded guilty to five counts of aggravated robbery and the remaining four counts were dismissed. Wells was sentenced to concurrent sentences of 3 to 10 years for the Wyandotte High School incident and 10 to 20 years for each of the other offenses.

Robert Thomas was charged with nine counts of aggravated robbery in the Shop-n-Go, Hardee's, and Best Western incidents. The charges were dismissed for insufficient evidence.

Elbert Roddy was initially charged with two counts of aggravated robbery in the Wyandotte High School incident. He pleaded guilty to an amended information charging one count of simple robbery. He was sentenced to 3 to 10 years for that offense, and the sentence was ordered to run consecutive to sentences in three other cases.

The presentence investigation (PSI) report informed the sentencing court of the disposition of Roddy's and Thomas' cases. Wells' case had not yet been disposed of at the time of Davis' sentencing. The court was informed of Wells' sentences at Davis' modification hearing.

Davis cites *State v. Smith*, 254 Kan. 144, 864 P.2d 709 (1993); *State v. Bailey*, 251 Kan. 527, 834 P.2d 1353 (1992); and *Cochrane v. State*, 4 Kan. App. 2d 721, 610 P.2d 649 (1980). Davis argues that he was not the driving force behind the crimes, and he asserts that Wells' participation was equal to or greater than Davis' involvement in the offenses. Davis points out that the Kansas Sentencing Guidelines evidence the legislative intent to treat similarly situated offenders similarly.

In *Bailey*, 251 Kan. 527, Syl. ¶ 2, this court held:

"In sentencing a convicted felon, a second trial judge is not restricted to imposing a sentence no greater than the sentence another judge previously imposed upon a codefendant for the same crime. The second judge, however, must consider the sentence given to the codefendant and, if a longer sentence is given, the reason for doing so should be set forth on the record."

There, the defendant and a codefendant were convicted of the same crimes, and they were sentenced to identical terms of incarceration for each of the offenses. However, three of the defendant's sentences were ordered to run consecutively, while only two of the codefendant's sentences were imposed consecutively. The result was a controlling term of incarceration of 45 years to life for the defendant and 30 years to life for the codefendant. This court found the defendant's sentence to be an abuse of discretion, noting that the defendant was less culpable than the codefendant. 251 Kan. at 531.

Davis points out that the trial court, in refusing to modify his sentence, stated, "The fact of the matter is here, when I impose[d] the sentence I did in this case, it had nothing to do with what any codefendant got, what any codefendant pled to." He reasons that this statement reflects the trial court's failure to comply with *Bailey*.

This court recently revisited the issue of disparate sentences in *Smith*. There, the defendant was sentenced to a controlling term of incarceration of 20 years for two counts of attempted second-degree murder and one count of kidnapping. One codefendant received a controlling term of 8 to 20 years for one count of attempted first-degree murder and one count of aggravated battery. Another codefendant was sentenced to 3 to 10 years for one count of aggravated battery. This court stressed that the codefendants were not sentenced for the same offenses nor the same number of offenses as the defendant. We stated:

"Generally, disparity in the sentences of codefendants does not amount to abuse of discretion where the trial court considers the individual characteristics of the defendant being sentenced, the harm caused by that defendant, and the prior criminal conduct of that defendant."

"A trial judge is not bound to sentence a defendant to a term equal to or shorter than the sentence given his or her codefendant. When a defendant receives a longer sentence than his or her codefendant, and reasons therefor appear in the record, the sentence imposed will be tested on appeal against a standard of abuse of discretion." *Smith*, 254 Kan. 144, Syl. ¶¶ 4-5.

In sentencing the defendant in *Smith*, the trial court did not expressly comment on the codefendants' sentences, although the court was aware of those sentences. This court found no abuse

of discretion, noting that the trial court clearly considered the defendant's more culpable role in the offenses. This court concluded:

"The defendant received a much harsher sentence than [the codefendants]. The defendant was convicted of different crimes, however, and the court stated that it perceived her to be the driving force behind the initiation and continuation of the offenses. Given the differences in crimes and the court's statements on the record, *Bailey's* requirements are satisfied." 254 Kan. at 157.

Davis acknowledges that this court's opinion in *Smith* distinguishes *Bailey* in part where the codefendant is convicted of a lesser crime than the defendant. However, Davis argues that the deciding factor in *Smith* was the defendant's role as the driving force behind the crimes committed. Davis asserts that the trial court made no finding here that he was the driving force behind the crimes committed. Moreover, Davis contends he was less culpable than his codefendants and that Thomas was the ringleader, even though charges against Thomas were dismissed. Davis also notes that in *Cochrane*, cited in *Bailey*, the court found an abuse of discretion due to disparate sentences despite the fact that the defendant was convicted of a greater crime (aggravated robbery) than the codefendants (robbery). *Cochrane*, 4 Kan. App. 2d at 722, 726-27. In *Cochrane*, the defendant was sentenced to 15 years to life while the codefendant most equally culpable was sentenced to 1-20 years, with execution of the sentence suspended and 5 years of probation imposed in lieu of incarceration.

The State argues that Davis was more culpable than his codefendants. The dismissal of charges against Thomas should have no bearing on Davis' sentence. Roddy was less culpable than Davis because Davis used a gun. The State also points out that Wells had not been sentenced at the time of Davis' sentencing. Though defense counsel informed the court at the modification hearing that Wells had a prior juvenile record, there was no evidence of that record. Moreover, Davis was convicted of nine counts of aggravated robbery, while Wells was only convicted upon his pleas of guilty to five counts of aggravated robbery and one count of simple robbery. The State argues that the court's comments overall do not reflect an abuse of discretion.

While this court has examined the issue of disparity in sentences between codefendants on several occasions, those cases have uniformly involved instances where the codefendants were convicted of and sentenced for the same offenses. See *Bailey*, 251 Kan. 527; *State v. Stallings*, 246 Kan. 642, 792 P.2d 1013 (1990); *State v. Johnson*, 239 Kan. 124, 716 P.2d 192 (1986); *State v. Goering*, 225 Kan. 755, 594 P.2d 194 (1979). In *Bailey* and *Goering*, this court found abuse of discretion in sentencing the defendant to a longer term of incarceration than the codefendant. In *Bailey*, the defendant was sentenced to a controlling term of 45 years to life, while the more culpable codefendant received 30 years to life. In *Goering*, the codefendants received long concurrent sentences, while the defendant was sentenced to consecutive maximum sentences, even though the defendant was the least culpable, merely drove the getaway car, and had no prior offenses. In *Stallings* and *Johnson*, no abuse of discretion was found. In *Stallings*, the defendant was sentenced to two concurrent terms of 15 years to life and two concurrent terms of 5 to 20 years, with the two sets to run consecutively, while the codefendant received the same terms of incarceration but all sentences were imposed concurrently. In *Johnson*, the defendant received consecutive sentences of life and 10 to 20 years, while the codefendant received concurrent sentences of life and 15 years to life.

Davis clearly received a much harsher sentence than his codefendants. The disparity between Davis' and Roddy's sentences really cannot be compared because the defendants were convicted of different crimes. See *Smith*, 254 Kan. at 156. Therefore, the trial court did not abuse its discretion in failing to consider Roddy's sentence. Wells had not yet been sentenced at the time of Davis' sentencing, so there cannot have been an abuse of discretion in failing to consider Wells' sentence at the time of Davis' sentencing. If there was an abuse of discretion, it must have occurred at the time of the modification hearing because it was at that point that the trial court was aware of the disposition of Wells' cases. See *Cochrane*, 4 Kan. App. 2d at 727.

However, despite the harshness of Davis' sentences, we are unable to find that the trial court abused its discretion because

of the disparity between the sentences imposed upon Wells and Davis. Davis was convicted of nine counts of aggravated robbery. He refused to accept responsibility for the offenses. He used a gun in committing the offenses, creating a substantial danger to his victims. Wells, on the other hand, pleaded guilty to five counts of aggravated robbery and one count of simple robbery. Based on the evidence, it is difficult to determine whether Wells or Davis was more culpable overall. Amanda Radley identified Davis as the man who robbed her at the Best Western, and Davis, in his statement to police, admitted that Wells remained in the Explorer during that incident. Further, during the Wyandotte High School incident, Wells remained in the car while Davis was the active participant. However, it appears the crimes to which Wells pleaded guilty included one count of aggravated robbery in the Shop-n-Go incident, two counts of aggravated robbery in the Hardee's incident, and two counts of aggravated robbery in the Best Western incident, whereas Davis was acquitted of any responsibility in the Shop-n-Go incident.

The trial court did not expressly discuss the sentences imposed upon the codefendants. However, the court did find that Davis was a main participant and noted that Davis continued to deny responsibility for his actions. The evidence against Davis was overwhelming. The crimes committed were dangerous and all involved the use of a gun. The court opined that Davis was extremely dangerous and that the sentences imposed were to protect the community from him. The court gave sufficient reasons for the sentence it imposed even though the sentence was greater than that imposed on Wells. There was no abuse of discretion.

Affirmed.