No. 61,909

STATE OF KANSAS, *Appellee,* v. RONALD E. SWITZER, *Appellant.*

(769 P.2d 645)

Opinion filed March 3, 1989.

*Shannon S. Crane,* assistant appellate defender, argued the cause and *Benjamin C. Wood,* chief appellate defender, was with her on the brief for appellant.

*Sue Carpenter,* assistant district attorney, argued the cause and *Robert T. Stephan,* attorney general, and *Gene M. Olander,* district attorney, were with her on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: Ronald E. Switzer appeals his jury convictions of one count of rape and two counts of aggravated criminal sodomy. He

was sentenced to fifteen years to life imprisonment for each count, to run concurrently.

Switzer contends his convictions should be reversed because there was not sufficient evidence at trial to convince a rational factfinder of his guilt beyond a reasonable doubt. Under the Due Process clause of the 14th Amendment, no person may be convicted of a crime unless every fact necessary to establish the crime with which he is charged is proven beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 368, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970).

In *State v. Voiles*, 226 Kan. 469, 601 P.2d 1121 (1979), we adopted the scope of appellate review set forth in *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781, *reh. denied* 444 U.S. 890 (1979). Under this scope of review, we are required to review all the evidence in the light most favorable to the prosecution in order to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.

The facts are as follows. The victim was attacked as she was returning to her apartment at approximately 8:00 p.m. on November 18, 1986. Her assailant put his hand over her mouth and pushed her into a back bedroom. The assailant struck the victim and forced her to perform oral sex. He raped her, rolled her over and inserted his fingers into her vagina and anus, raped her a second time, and again forced her to have oral sex with him. The victim estimated the entire ordeal lasted about an hour. The room was not directly lit, but she could see the man because lights were on in the living room and another bedroom. She saw his face at least half the time he was there. The assailant told her that because she could identify him he would come back and kill her if she told anyone what had happened.

After the assailant left, the victim lay huddled on her bed for at least an hour in fear her attacker was still in the house and would kill her if she took any action. When her fears subsided, she attempted to contact her boyfriend, a police officer. At first she could not reach him so she called a friend, who arrived at approximately 10:45 p.m. Her boyfriend arrived about 20 minutes later and called the police station.

The victim was examined at a hospital, where she gave a statement to the police. She gave a more complete statement

later when she assisted in making a composite picture of the rapist. She described him to the police as a man in his mid-to-upper 30's, 6 feet tall, weighing approximately 220 pounds with a potbelly and heavy jowls. She said he had dark hair, a mustache, and a hairy chest. He did not wear glasses. She described his voice as calm and commanding. She said the man had a very offensive body odor, as of one who did not bathe often, which she noticed as soon as he came up behind her and put a hand over her mouth. She thought he must have been wearing slip-on shoes, because he was able to get out of them quickly. Although of normal hearing, she did not hear his approach at all. She looked at photographs of possible suspects, but found no one who resembled the assailant.

Nearly four months went by with no arrests. Then, on March 10, Ronald Switzer was seen by the victim at an Alcoholics Anonymous (AA) meeting in Silver Lake. Switzer had previously attended AA meetings elsewhere. This was the first time he had attended such a meeting in Silver Lake. Switzer sat down next to the victim, who became positive he was her assailant. She spent 30 minutes frozen to her chair trying to discover a feature or characteristic of Switzer which would prove her wrong. Switzer wore glasses, did not have a mustache, and had shorter hair. Other than that, she testified he matched her memory of the assailant in every way. She left the meeting and called her boyfriend, who advised her to get Switzer's license tag number from his car when he left, which she did. Upon returning to the meeting, she asked Switzer his telephone number, saying she needed to reach him if the place for the meetings had to be changed. Switzer gave her his correct number, and from this and his license tag, his full identity was discovered.

After the meeting, the victim moved to a different apartment because her fears were renewed by having seen her alleged assailant again. At the victim's next AA meeting, Switzer was again present. The victim became so frightened she went into the bathroom and was physically ill. She testified that, later in the meeting, Switzer made a general comment that he worked for the postal service and could find anybody's address information.

Switzer testified he only mentioned he worked for the postal service and denied stating he had access to change of address information. He testified he used to attend AA meetings years

ago, and began attending again on his counselor's advice because of the difficulties he was experiencing with his marriage. He explained he attended the meetings at Silver Lake because he lived there.

On Saturday morning, March 28, at approximately 10:00 a.m., the victim found a cassette in her mailbox. The cassette had not been mailed—it was not in an envelope or container of any sort. The cassette contained only one song, the words to which were, "[S]omeone is watching you and he's going to get you, and you can't escape the voice." The victim testified at the preliminary hearing she was certain she had checked her mail at noon on Friday. Thus, the tape would have had to have been deposited in her mailbox between noon Friday and 10:00 a.m. Saturday.

Michelle Gomez, a friend of Switzer's, testified she and Switzer met at 9:00 a.m. on Friday, March 27, and drove to Lincoln, Nebraska, to attend a cat show. They did not return until Monday due to snowy roads. Glenn Floerke of Lincoln testified he and his wife spent Friday evening with Switzer and Gomez until after midnight. Gomez testified it would not have been possible for Switzer to return to Topeka before Monday without her knowledge. She and Switzer were not apart for any significant amount of time and they had traveled to Lincoln in her car, to which she kept the keys. This scenario, coupled with the times established by the victim, would eliminate Switzer from blame for the tape and inferentially from being the rapist.

At trial, the victim changed her testimony from that at the preliminary hearing and said she could not remember whether she had checked the mail on Friday. This would allow for the possibility that Switzer put the tape in her mailbox before he left for Lincoln with Gomez.

Two weeks after the preliminary hearing, at which she identified Switzer as her assailant, the victim found the words "Your [sic] Dead" painted on her door.

The evidence against Switzer at trial was as follows: The victim testified she was certain of her identification. She said she recognized Switzer by his height, weight, potbelly, heavy jowls; his hair color, texture, and hairline; and his voice in terms of calmness, volume, pitch, and timbre. Male chest hair and animal hair were found in the bedroom; the victim kept no pets. Switzer had hair on his chest and spent a lot of time at the home of

Gomez, who kept nine cats. The victim's address was among those for which Switzer was responsible as a letter sorter at the postal service.

There was evidence, on the other hand, in Switzer's favor: Hair and seminal fluid analysis provided no evidence Switzer was the assailant. He had never before been accused of any sort of crime. Switzer testified he did not commit the crimes for which he was charged, or the harassing acts which followed. He testified he was with his estranged wife, Carol Switzer, on the night of November 18 until 9:30, when he went to work. He began work that night at 10:05 p.m. Switzer testified he had worn glasses since he was five years old and was never without them. He said he had never worn contact lenses. He testified he always wore cowboy boots which he could not remove while standing up. He said he had tried jogging shoes once or twice but did not like the way they felt. He said he had been told "more times than I can count" that he had a noisy, shuffling gait. He testified personal hygiene was important to him, and that he bathed once or twice a day.

Carol Switzer testified she specifically remembered having dinner at Hunam's Restaurant with Switzer the night of November 18 because they were celebrating her birthday. She testified Switzer did not leave for work until 9:30 p.m. She testified he did not have an offensive odor and was, as always, wearing his glasses.

Switzer's optometrist testified Switzer's vision required him to wear eyeglasses, and he had no knowledge that Switzer had ever worn contacts. Several people, including Switzer's former co-workers and his stepdaughters, testified Switzer did not have offensive body odor.

Former co-workers testified they could always tell when Switzer was approaching because he shuffled his boots when he walked. They also testified Switzer would not have access to change of address information. They further testified letter sorters handle 50 letters per minute. The letter stops for an instant in front of the sorter via an arm on the sorting machine. In that instant the sorter must read the address and key the letter to the correct carrier before the letter disappears into another section of the machine outside the sorter's area. It would thus be difficult to recognize and memorize a specific address.

Switzer himself, however, said that although he did not have access to change of address information, if someone in his area had moved but was still within his zone, he could recognize that fact by the yellow change-of-address sticker on the envelope. There was also evidence the employees sometimes hand-sorted mail, at which time they could pause to note a new address if it happened to come through and they were interested.

The court denied Switzer's post-conviction motion for a new trial where he claimed insufficient evidence to support his convictions.

Switzer argues the prosecution's evidence was insufficient because it primarily consisted of the victim's eyewitness identification. In *State v. Warren,* 230 Kan. 385, 389, 635 P.2d 1236 (1981), we acknowledged that "the unreliability of eyewitness identification and the conviction of innocent people as a result thereof has been a matter of concern for the judiciary." Switzer cites some of the sources used in our discussion in *Warren,* in which we held refusal to accept expert testimony on the unreliability of eyewitness identification is within the trial court's discretion, but a cautionary instruction may be required where eyewitness identification is critical and there is a serious question as to the identification.

The hazards of eyewitness identification of a stranger have been recognized by the United States Supreme Court. See *United States v. Wade,* 388 U.S. 218, 228, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967). Fishman and Loftus, in their article, *Expert Psychological Testimony on Eyewitness Identification,* 4 Law & Psychology Rev. 87, 92 (1978), state that extreme stress decreases the reliability of eyewitness testimony.

Fishman and Loftus also find that, once a person has committed himself or herself to a description, the person is likely to adhere to it, and the more often he or she repeats it, the less likely he or she is to doubt it. 4 Law & Psychology Rev. at 92. The degree of certainty demonstrated by a witness has been statistically shown to have no correlation with the accuracy of the identification. See studies cited in *People v. McDonald,* 37 Cal. 3d 351, 369, 208 Cal. Rptr. 236, 690 P.2d 709 (1984). In contradiction, *Warren,* 230 Kan. at 390, suggests certainty as one of five factors to be considered in testing reliability of eyewitness identification.

Switzer argues the victim's memory of her attacker was distorted by the horrible conditions under which she saw the attacker in the unlit room. He also argues the lapse of time between the crime and the victim's identification of him as her attacker also militates against accuracy. See the fifth factor in *Warren,* 230 Kan. at 390. He theorizes that when the victim saw someone who resembled her memory of the assailant she became so frightened that her very fear convinced her of the accuracy of her identification. This fear led her to believe Switzer was directing a threat to her when he mentioned at an AA meeting that he worked for the postal service.

While acknowledging that caution is required in considering a case in which a conviction is supported primarily by eyewitness testimony, we note that the jury was instructed as to six factors affecting reliability of eyewitness testimony and was also instructed it could consider any other circumstances it found may have affected the accuracy of the identification. Viewing all the evidence in the light most favorable to the prosecution, we find the evidence, though strongly controverted, is such that a rational factfinder could find Switzer guilty beyond a reasonable doubt.

The final issue is whether one count of Switzer's convictions for aggravated criminal sodomy must be reversed because the evidence does not support count two of the complaint.

Count two of the complaint filed against Switzer alleged he "unlawfully, feloniously and willfully engage[d] in anal copulation" with the victim while she was overcome by force or fear. The evidence was that Switzer had inserted his fingers into the victim's anus. Switzer charges this evidence is insufficient to prove he forcefully engaged the victim in anal *copulation.*

Sodomy is defined in K.S.A. 21-3501(2) as "oral or anal copulation; oral or anal copulation or sexual intercourse between a person and an animal; *or* any penetration of the anal opening by any body part or object." (Emphasis supplied.)

The prosecution had the option of charging the commission of sodomy in three different ways to conform to the evidence. See *State v. Saylor,* 228 Kan. 498, 503, 618 P.2d 1166 (1980). The State failed to amend its complaint to conform, leaving only an allegation of "anal copulation" where the evidence showed Switzer penetrated the victim's anus with his fingers.

We first consider the prosecution's argument that Switzer's penetration of the victim's anus with his fingers can be construed to be "anal copulation," as alleged in the complaint. The State is incorrect in its argument that there is no substantive difference between the first and third phrases of K.S.A. 21-3501(2). The first phrase prohibits nonconsensual penetration by the male sex organ into a mouth or anus. The third phrase prohibits nonconsensual penetration of the anus by any object or body part other than the male sex organ.

In construing a statute, effect must be given, if possible, to every part of the statute. *State v. Adee*, 241 Kan. 825, 829, 740 P.2d 611 (1987). Where a criminal statute is questioned, we are required to strictly construe the statute in favor of the accused. *State v. Magness*, 240 Kan. 719, 721, 732 P.2d 747 (1987). We thus hold the evidence does not support the complaint as originally drawn.

We must therefore consider whether the complaint was validly amended. Toward the end of trial, the prosecutor moved the court to amend count two, saying:

"I note that oral or anal copulation is set off in the alternative by an 'or,' with the section, '. . . or any penetration of the anal opening by any body part . . . .' In a sense, it is set out in the alternative.

"I would like to amend the language to read 'That on or about the 18th day of November, 1986, in the County of Shawnee, State of Kansas, Ronald E. Switzer did then and there, unlawfully, feloniously, and willfully, penetrate the anal opening of [name withheld] by a body part; to-wit: a finger, when the person did not consent and when [name withheld] was overcome by force or fear.

"I think the Court's instruction, as it's proposed, does very accurately reflect exactly the nature of the testimony that's been adduced at trial, and I think that amendment would bring the charging document into very strict conformity with exactly the evidence that's been adduced."

The prosecutor was granted leave to amend the complaint. Defense counsel did not object, but requested the oral amendment be reduced to written form.

Where leave is granted by the court for the prosecution to amend a complaint, the prosecution has the duty to memorialize the amendment by filing an amended complaint, by interlineation upon the original document, or by journal entry stating the amendment to the complaint. *State v. Rasch*, 243 Kan. 495, 501, 758 P.2d 214 (1988). In *State v. Nunn*, 244 Kan. 207, Syl. ¶ 18, 768 P.2d 268 (1989), we held that, where an oral motion to amend is sustained on the record before the verdict is rendered,

the amendment is effective, absent prejudice to the defendant, even where the prosecution does not memorialize the amendment by journal entry until after trial.

In the case at bar, we have a situation similar to that in *Nunn*, except here the prosecution failed to amend in writing the complaint after leave to do so was granted, even by journal entry filed after the verdict. Thus, the issue is whether the omission invalidates the verdict. We hold it does not. Switzer has not been prejudiced by the prosecution's failure to properly memorialize the amendment. He had notice of the amendment having been made on the record. See *State v. Dodd*, 11 Kan. App. 2d 513, 515, 728 P.2d 402 (1986). The omission is thus not reversible error, although this finding does not excuse the prosecution from fulfilling its duty of memorializing the amendment.

The judgment is affirmed. The State is ordered to amend the journal entry nunc pro tunc showing the corrected complaint.