**Ronald E. SWITZER, Petitioner,**

v.

**Robert HANNIGAN, et al., Respondents.**

No. 96–3107–DES.

United States District Court, D. Kansas.

March 30, 1999.

Ronald Eugene Switzer, Hutchinson, KS, pro se.

Kevin C. Fletcher, United States Attorney's Office, Sioux City, IA, for Respondents.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on a petition for habeas corpus filed pursuant to 28 U.S.C. § 2254 by an inmate in the custody of the Secretary of the Kansas Department of Corrections.

Petitioner was convicted in 1987 in the District Court of Shawnee County, Kansas, of one count of rape and two counts of aggravated criminal sodomy. He was sentenced to concurrent terms of fifteen years to life on each count.

### Factual Background

The following summary of the facts in this matter is taken from the decision of the Kansas Supreme Court in petitioner's direct appeal, *State v. Switzer*, 244 Kan. 449, 769 P.2d 645 (Kan.1989):

> The victim was attacked as she was returning to her apartment at approximately 8:00 p.m. on November 18, 1986. Her assailant put his hand over her mouth and pushed her into a back bedroom. The assailant struck the victim and forced her to perform oral sex. He raped her, rolled her over and inserted his fingers into her vagina and anus, raped her a second time, and again forced her to have oral sex with him. The victim estimated the entire ordeal lasted about an hour. The room was not directly lit, but she could see the man because lights were on in the living room and another bedroom. She saw his face at least half the time he was there. The assailant told her that be-

cause she could identify him he would come back and kill her if she told anyone what had happened.

After the assailant left, the victim lay huddled on her bed for at least an hour in fear her attacker was still in the house and would kill her if she took any action. When her fears subsided, she attempted to contact her boyfriend, a police officer. At first she could not reach him so she called a friend, who arrived at approximately 10:45 p.m. Her boyfriend arrived about 20 minutes later and called the police station.

The victim was examined at a hospital, where she gave a statement to the police. She gave a more complete statement later when she assisted in making a composite picture of the rapist. She described him to the police as a man in his mid-to-upper 30's, 6 feet tall, weighing approximately 220 pounds with a potbelly and heavy jowls. She said he had dark hair, a mustache, and a hairy chest. He did not wear glasses. She described his voice as calm and commanding. She said the man had a very offensive body odor, as of one who did not bathe often, which she noticed as soon as he came up behind her and put a hand over her mouth. She thought he must have been wearing slip-on shoes, because he was able to get out of them quickly. Although of normal hearing, she did not hear his approach at all. She looked at photographs of possible suspects, but found no one who resembled the assailant.

Nearly four months went by with no arrests. Then, on March 10, Ronald Switzer was seen by the victim at an Alcoholics Anonymous (AA) meeting in Silver Lake. Switzer had previously attended AA meetings elsewhere. This was the first time he had attended such a meeting in Silver lake. Switzer sat down next to the victim, who became positive he was her assailant. She spent 30 minutes frozen to her chair trying to discover a feature or characteristic of

Switzer which would prove her wrong. Switzer wore glasses, did not have a mustache, and had shorter hair. Other than that, she testified he matched her memory of the assailant in every way. She left the meeting and called her boyfriend, who advised her to get Switzer's license tag number from his car when he left, which she did. Upon returning to the meeting, she asked Switzer his telephone number, saying she needed to reach him if the place for the meetings had to be changed. Switzer gave her his correct number, and from this and his license tag, his full identity was discovered.

After the meeting, the victim moved to a different apartment because her fears were renewed by having seen her alleged assailant again. At the victim's next AA meeting, Switzer was again present. The victim became so frightened she went into the bathroom and became physically ill. She testified that, later in the meeting, Switzer made a general comment that he worked for the postal service and could find anybody's address information.

Switzer testified he only mentioned he worked for the postal service and denied stating he had access to change of address information. He testified he used to attend AA meetings years ago, and began attending again on his counselor's advice because of the difficulties he was experiencing with his marriage. He explained he attended the meetings at Silver Lake because he lived there.

On Saturday morning, March 28, at approximately 10:00 a.m., the victim found a cassette in her mailbox. The cassette had not been mailed—it was not in an envelope or container of any sort. The cassette contained only one song, the words to which were, "[S]omeone is watching you and he's going to get you, and you can't escape the voice." The victim testified at the preliminary hearing she was certain she had checked her mail at noon on Friday. Thus, the tape would have had to have been deposited in her mailbox between noon Friday and 10:00 a.m. Saturday.

Michelle Gomez, a friend of Switzer's, testified she and Switzer met at 9:00 a.m. on Friday, March 27, and drove to Lincoln, Nebraska, to attend a cat show. They did not return until Monday due to snowy roads. Glenn Floerke of Lincoln testified he and his wife spent Friday evening with Switzer and Gomez until after midnight. Gomez testified it would not have been possible for Switzer to return to Topeka before Monday without her knowledge. She and Switzer were not apart for any significant amount of time and they had traveled to Lincoln in her car, to which she kept the keys. This scenario, coupled with the times established by the victim, would eliminate Switzer from blame for the tape and inferentially from being the rapist.

At trial, the victim changed her testimony from that at the preliminary hearing and said she could not remember whether she had checked the mail on Friday. This would allow for the possibility that Switzer put the tape in her mailbox before he left for Lincoln with Gomez. Two weeks after the preliminary hearing, at which she identified Switzer as her assailant, the victim found the words "Your [sic] Dead" painted on her door. 769 P.2d at 647–648.

## Discussion

Petitioner challenges the jury verdict on two grounds: first, he alleges there was insufficient evidence for a factfinder to determine guilt beyond a reasonable doubt, and second, he alleges he received ineffective assistance from his counsel.

In examining a claim of insufficiency of the evidence on habeas corpus, a federal court must evaluate "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The court is not to weigh conflicting evidence or the credibility of witnesses, *Kelly v. Roberts*, 998 F.2d 802, 808 (10th Cir. 1993), but must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir.1993). Thus, the court must "presume that the jury's findings in evaluating the credibility of each witness are correct" and may ignore testimony only when it finds it "inherently incredible." *Tapia v. Tansy*, 926 F.2d 1554, 1562 (10th Cir.), *cert. denied*, 502 U.S. 835, 112 S.Ct. 115, 116 L.Ed.2d 84 (1991) (citations omitted). Such a finding may be made only where the testimony is "unbelievable on its face, i.e., testimony as to facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature." *Id.* (quoting *United States v. Garner*, 581 F.2d 481, 485 (5th Cir.1978)).

■ In this case, the core issue to be resolved by the jury was the identity of the assailant. The physical evidence was essentially inconclusive, as the serological evidence did not identify or exclude petitioner, nor was animal hair found at the scene ever linked to the pets kept by petitioner or his friend Ms. Gomez.

The victim testified that she was positive that petitioner was her assailant and described his hair, voice, height, weight, and other physical characteristics as consistent with her observations on the night she was attacked. Her address was within the area for which petitioner sorted mail, and there was some evidence that a person in his work could obtain change of address information. The victim received two threatening messages at the residence to which she moved shortly after she encountered petitioner at the March 10, 1987, AA meeting.

The jury also heard testimony that petitioner had no prior criminal history, suffered from very poor vision and always wore glasses, had a distinctive shuffling gait, and bathed often. None of the witnesses had ever known petitioner to be without his glasses or to have any offensive body odor. Petitioner presented alibi testimony which accounted for his whereabouts on much of the evening the assault took place and on the weekend during which the victim found the threatening cassette tape in her mailbox. Numerous co-workers testified that petitioner would not have been able to obtain change of address information in the course of sorting mail due to the rate of speed at which mail is processed, although there was some indication that when mail is hand-sorted, an employee might notice a new address.

Viewing the evidence in the light most favorable to the prosecution, the court concludes that a rational trier of fact, if convinced by the testimony of the victim and the circumstantial evidence presented, could find that petitioner was the assailant. However, given the absence of any physical evidence connecting petitioner to the crime and given the well-established frailties of eyewitness identification, it must be noted that a contrary verdict was well within the range of possibility. But the governing standard of review constrains the court to accept the jury's resolution unless its decision is beyond reason, and the court concludes that there was sufficient evidence before the jury to sustain its verdict.

Petitioner also claims he was denied the effective assistance of counsel at trial. The applicable standard of review for such a claim is well-established and requires a showing of reasonably effective assistance. The court must determine "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To establish ineffective assistance of counsel sufficient to warrant reversal of a conviction, the defendant must show that counsel's performance was deficient and that this deficient

performance prejudiced the defense." *United States v. Pena,* 920 F.2d 1509, 1518 (10th Cir.1990), *cert. denied,* 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991) (citing *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052). The court must be mindful that it examines the record with the benefit of hindsight, and should endeavor to "reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. There is a strong presumption that counsel provided effective assistance. *Id.*

Petitioner specifically challenges his trial counsel's failure to challenge the lab test done by the Kansas Bureau of Investigation, his use of defense witnesses, and his failure to produce a photograph of petitioner taken shortly before the crime.

The court construes petitioner's claim concerning lab tests to encompass both the defense decision not to contest the admission of the serology tests and the failure to seek tests of animal hairs found on the victim's bedding.

■ Petitioner's trial counsel testified during a postconviction proceeding that because the serology tests were not incriminating, he did not seek to have them excluded, but instead capitalized on them to demonstrate his client's willingness to cooperate in the investigation by providing samples voluntarily. (R., Vol. II, Transcript of proceedings held 10/4/93, pp. 21–23.)

■ Counsel also testified during the proceeding that he did not seek a species-specific examination of the animal hairs found at the crime scene. Because petitioner intended to offer an alibi which would reflect his interest in cats and his attendance of a cat show, and because there was evidence of his friendship with a woman who kept nine cats, the positive identification of the hairs as cat hairs could have damaged Petitioner's defense. *Id.* at pp. 25–29.

These decisions clearly were strategic choices by counsel, and the court finds no evidence that counsel committed unprofessional errors which undermined his effectiveness. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

■ Petitioner next claims his counsel failed to adequately use defense witnesses by failing to call an expert in eyewitness identification, failing to have an optometrist provide a demonstration of petitioner's limited vision, and failing to call a postal employee to establish that petitioner had no access to changes of address.

First, the record shows that although defense counsel did not call an expert on eyewitness identification, the jury was given a cautionary instruction on this point which underscored the problems associated with identification.

■ Similarly, although defense counsel did not present a demonstration to the jury to illustrate the petitioner's uncorrected vision, petitioner's optometrist testified at trial concerning petitioner's limited vision. Counsel acknowledged during the postconviction proceeding that, in hindsight, such a demonstration might have been helpful.

■ Finally, petitioner alleges his trial counsel failed to call an employee of the postal service to establish that petitioner would not have had access to address change information and that such information ordinarily can be obtained upon request by anyone. The trial record, however, shows that numerous postal employees were called to testify as defense witnesses. The evidence, as a whole, suggested that the speed at which mail is sorted rendered it unlikely that petitioner could have obtained the victim's new address, but that in some circumstances, such as in hand-sorting mail, a postal employee might be able

to note a new address. *State v. Switzer,* 769 P.2d at 649.

These points, however, do not establish that counsel was unprofessional or ineffective. Decisions on how to present evidence and argument to a jury are within the professional judgment of counsel, and in this case, it is apparent that the jury was made aware of the points in question, namely, petitioner's limited access to change of address information, his poor vision without his glasses, and the reliability questions associated with eyewitness identification of a stranger. Petitioner does no more than argue that other forms of presentation might have been more influential at trial, and his claims are insufficient to undermine confidence in the process afforded him during trial.

Petitioner's final point is that his counsel was deficient in failing to obtain a photograph of him taken shortly before the crime occurred. Petitioner contends that this photograph, taken by a Regiscope[1] system when he cashed a payroll check at a local grocery store, would have established that he was clean shaven, contrary to the victim's statement that her assailant had a mustache.

The record of the postconviction proceeding shows petitioner's counsel made some effort to obtain the photograph through contacts with the postal service, which had access to the canceled check, and with the Regiscope company. These efforts were not successful. Had a photograph been located, and had it shown petitioner to be without a mustache shortly before the crime, its impact could have been significant.

In considering this point, the state district court noted that there is now no way to determine whether such a picture existed. Testimony at the postconviction proceeding revealed that an investigator from the public defender's office located the appropriate personnel at Regiscope within a short time but then learned that film is destroyed after two years. (R., Vol.II., pp. 129–132.) Viewed in the context of the entire record and in counsel's position at the time of the preparation of a defense, counsel's failure to obtain the photograph is not sufficient to undermine confidence in the fundamental fairness of the petitioner's trial. It is evident that this matter was vigorously litigated by both the prosecution and the defense and that the issues of alibi and identification required the jury to determine close questions of credibility. Having carefully considered the petitioner's allegation of ineffective assistance of counsel, the court finds no merit to the claim.

IT IS THEREFORE ORDERED the petition for habeas corpus is denied and this matter is dismissed.

**IT IS SO ORDERED.**

---

1. The Regiscope camera system is used in business establishments to photograph customers and their commercial paper for identification.