No. 81,955

STATE OF KANSAS, *Appellee*, v. MARK A. JACQUES, *Appellant*.

(14 P.3d 409)

Opinion filed December 8, 2000.

*Michael S. Holland*, of Holland and Holland, of Russell, argued the cause, and *Michael S. Holland II*, of the same firm, *Elizabeth Seale Cateforis*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were with him on the briefs for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Charles R. Reimer*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the briefs for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Mark A. Jacques, from his convictions in two separate incidents. Jacques was charged with battery and possession of cocaine for events that occurred on February 19, 1998. He was also charged with felony murder, with possession of cocaine as the underlying felony crime, and possession of cocaine for events that occurred on March 1, 1998.

On February 19, 1998, Jacques was arrested when Mark Ailsbury came home after drinking all night and began "belting" the house

with stones. The police were called and it was alleged that Jacques had struck Ailsbury in the face. Jacques denied that he had struck Ailsbury, and the jury later acquitted him of the battery charge. After his arrest, he was searched and police officers found a small set of plastic scales on him. There was residue on the scales that tested positive for cocaine. The jury found Jacques guilty of possession of cocaine. Jacques defended against this charge by claiming that the shirt and the scales were not his, but rather belonged to his cousin Ronald Everitt.

Jacques and Everitt were close friends and cousins who took drugs together. On March 1, 1998, Jacques and Everitt invented a scheme to purchase drugs. The drugs were allegedly to be purchased for a third person from Charlie Rogers and Jacques' sister, Julie Jakes, who was living with Rogers. Jacques rode part way to Rogers' house with Everitt. Jacques was dropped off at a nearby Dillon's store where he was to wait until Everitt returned. He did not accompany Everitt to Rogers' house because he had been barred from going there as he was suspected of stealing from the house. Both Jacques and Everitt were armed with steak knives.

After approximately 45 minutes, Jacques, who was cold and bored, walked to Rogers' house. After Jacques knocked on the door, Everitt rushed at him and began beating on him. Everitt was angry at Jacques because he was not supposed to be at the house and he felt his presence would "kill" the deal. Everitt cursed at Jacques and threatened to kill him. Everitt knocked Jacques down, kicked him in the face, and knocked out one of his teeth. Jacques pulled out the steak knife and stabbed Everitt. Although Everitt was conscious for a period of time, he eventually died as a result of the knife wound.

At trial, Jacques claimed that he had stabbed Everitt in self-defense and that after the stabbing Everitt threatened him with a knife and demanded that Jacques go into the house and complete the drug transaction. Jacques went into the house, subsequently came out, and drove Everitt to another location in an attempt to get someone to drive Everitt to the hospital. By the time Everitt got to the hospital, he was dead on arrival, having bled to death from two severed veins.

Additional facts will be set forth as necessary in discussing the issues. Jacques was found guilty of possession of cocaine for the February 19 events, and he was found guilty of possession of cocaine and felony murder for the March 1 events. He was sentenced to life imprisonment for the felony-murder charge and 26 months for the drug charges, with the sentences to run consecutively.

Jacques raises six issues on appeal: (1) whether the trial court erred in refusing to give an instruction on self-defense in relation to the felony-murder charge; (2) whether the trial court erred when it prevented Jacques from asking questions on recross-examination regarding bias and motivation for testifying; (3) whether the trial court erred when it denied Jacques' motion to suppress his statement; (4) whether there was sufficient evidence to support the conviction for felony murder; (5) whether the trial court had subject matter jurisdiction over the case; and (6) whether the trial court erred in consolidating the charges against Jacques.

## I. SELF-DEFENSE INSTRUCTION

Jacques argues that the trial court erred when it refused to give an instruction on self-defense for the felony-murder charge. The trial court instructed the jury on self-defense for all of the other lesser included offenses. Jacques asserts that possession of cocaine is not a "forcible felony" pursuant to K.S.A. 21-3110(8) and that it cannot, therefore, serve as a barrier to asserting self-defense pursuant to K.S.A. 21-3214(1).

Jacques offered a proposed instruction which would have allowed the jury to consider self-defense on the felony-murder charge. The trial court instead used the following instruction:

"A person is not justified in using force in defense of himself if he is committing or attempting to commit possession of cocaine, an inherently dangerous felony.

"If you find from the evidence that the defendant was not committing or attempting to commit possession of cocaine at the time of the killing, then you may consider that the defendant was justified in using force to defend himself.

"The defendant has claimed his conduct was justified as self-defense.

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful

force. Such justification requires both a belief on the part of defendant and the existence of facts that would persuade a reasonable person to that belief."

Although Jacques offered a proposed jury instruction, he did not object to the instruction given.

The evidence on the record reveals that Jacques went to his sister's house, after waiting for 45 minutes at the Dillon's store, and was pushed and beaten by Everitt as soon as he arrived. Everitt cursed at Jacques and threatened to kill him. Everitt knocked out one of Jacques' teeth and beat him on the ground. Jacques pulled out the knife, a knife that Everitt had given him, and stabbed at Everitt when Everitt attempted to beat him some more. We conclude that there is a real possibility that the jury would have returned a different verdict had it been given the opportunity to consider self-defense for the felony-murder charge.

Although we conclude that there is a real possibility that the jury would have returned a different verdict had it been allowed to consider self-defense in the felony-murder charge, our analysis does not end there. We must also consider whether it would have been legally proper to instruct the jury on self-defense, given the prohibition set forth in K.S.A. 21-3214(1). See *State v. Mitchell*, 262 Kan. 687, 695-96, 942 P.2d 1 (1997) (although determining the standard of review was clearly erroneous because of trial counsel's failure to object to the instruction, the court evaluated whether the instruction would have been legally proper pursuant to K.S.A. 21- 3110[8]); *State v. Wise*, 237 Kan. 117, 123, 697 P.2d 1295 (1985) (holding that the instructions given were not clearly erroneous but also suggesting that even if the court would have concluded that the jury might have reached a different verdict, it would not have been proper to give the lesser included offense instructions as there was no evidence to support the instructions); and *State v. Cady*, 248 Kan. 743, 749, 811 P.2d 1130 (1991) (holding that failure to give the diminished capacity instruction was not erroneous under any standard of review as there was no evidence to suggest that the defendant lacked the capacity to kill his ex-girlfriend). K.S.A. 21- 3214 provides in pertinent part:

"The justification described in sections 21-3211 [use of force in defense of a person], 21-3212 [use of force in defense of a dwelling], and 21-3213 [use of force in defense of property other than a dwelling] is not available to a person who:

"(1) Is attempting to commit, committing, or escaping from the commission of a *forcible felony*." (Emphasis added.)

The question becomes whether possession of cocaine is a "forcible felony" as contemplated by the legislature. If it is, regardless of what standard of review we apply, it would have been inappropriate for the trial court to give the instruction requested by Jacques. Interpretation of a statute is a question of law over which this court has unlimited review. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

K.S.A. 21-3110(8) defines a forcible felony and provides that it

"includes any treason, murder, voluntary manslaughter, rape, robbery, burglary, arson, kidnapping, aggravated battery, aggravated sodomy and *any other felony which involves the use or threat of physical force or violence against any person*." (Emphasis added.)

Although K.S.A. 21-3110(8) does not specifically list possession of cocaine as a forcible felony, K.S.A. 21-3436(a)(14) defines possession of cocaine as an "inherently dangerous felony." The crimes in K.S.A. 21-3110(8), however, do not overlap completely with those listed in K.S.A. 21-3436. *Mitchell*, 262 Kan. at 694.

Whether possession of cocaine is a forcible felony is a question of first impression for this court. Previously, in *Mitchell*, this court considered whether the sale of cocaine was a forcible felony pursuant to K.S.A. 21-3110(8). In *Mitchell*, the felony-murder charge was supported by the sale of cocaine as the underlying felony. Like sale of cocaine, the possession of cocaine is an inherently dangerous felony as set forth in K.S.A. 21-3436(a)(14). Although the sale of cocaine is an inherently dangerous felony, on appeal Mitchell argued that the trial court should have given an instruction on self-defense because the sale of cocaine is not a forcible felony. We first noted that although there is some significant overlap between inherently dangerous felony and forcible felony, the lists provided by the legislature are not the same. After thoroughly discussing the legislative and judicial history behind the felony-murder statute and the accompanying inherently dangerous felony and forcible felony statutes, we held that the sale of cocaine is a forcible felony as contemplated by K.S.A. 21-3214(1) and K.S.A. 21-3110(8). In

so doing, we noted that the sale of cocaine in the abstract does "not involve any threat or use of physical force," although violence and threat "may frequently be involved in cocaine sales on the street." 262 Kan. at 695. We further considered, however, that the facts and circumstances surrounding the sale of cocaine in *Mitchell* supported our holding that it was a forcible felony, as both Mitchell and the victim carried and used concealed weapons.

In the present case, the crime was merely possessory, although there was a drug transaction involved which resulted in a death. The resulting death, although a factor in determining whether the felony was a forcible felony, is not dispositive however, as every felony used to support a felony-murder charge will be accompanied by a death.

In *State v. Underwood*, 228 Kan. 294, 615 P.2d 153 (1980), this court held that unlawful possession of a firearm by an ex-felon is not an inherently dangerous felony that could be used to support a felony-murder charge. In so doing, this court noted that unlawful possession of a firearm is not listed as a forcible felony, nor did it "fit within the catch-all phrase at the end of the definition." 228 Kan. at 305. In *Underwood*, this court specifically raised the concern that inclusion of possession of a firearm as a forcible felony would "strip an accused of the normal defenses possible in a murder case." 228 Kan. at 305. Our legislature has made significant changes since our decision in *Underwood*. See *Mitchell*, 262 Kan. at 693-94. In *Mitchell*, we looked beyond the "abstract" elements of the crime and considered the facts and circumstances surrounding the commission of the crime. Had *Underwood* been decided after *Mitchell*, it is likely that it would have been decided differently.

In the abstract, possession of cocaine does not involve physical force or violence against a person. However, there is an aura of violence surrounding the possession of illegal drugs. Those in possession of illegal drugs are often susceptible to being robbed or physically harmed by others wanting their drugs or money. Those in possession of illegal drugs are often a threat to others around them as well. Having possession of illegal drugs such as cocaine is often a deadly risk. In the present case, both Jacques and Everitt

were carrying knives for protection. Both had plans to cheat Jacques' friend out of his cocaine and keep it for themselves. Jacques bought the cocaine after he stabbed Everitt instead of driving him to the hospital, where Everitt's life might have been saved. The events of March 1 lent themselves to danger and the threat of violence against others. The circumstances involving the crime must be considered as well as the abstract elements of the crime. Our legislature has included the possession of cocaine as an inherently dangerous felony and although not all items found on the inherently dangerous felony list are included as forcible felonies, we hold that, under the specific facts of this case, possession of cocaine is a forcible felony as contemplated by K.S.A. 21-3110(8). As a result, the trial court did not err in refusing to allow the jury to consider self-defense on the felony-murder charge.

## II. OBJECTION TO QUESTIONS

The State put Everitt's brother David on the stand. Jacques argues that the trial court erred when it sustained the State's objections to questions asked by Jacques' counsel on recross- examination for the purposes of showing bias. On recross-examination the following took place:

"Q. Mr. Everitt, how close were you to your brother, Ronnie?
"A. Fairly close.
"Q. In age how close?
"A. Within five years.
"Q. Pretty upset that he was—that he died?
"A. Yeah.
"[PROSECUTOR]: These questions are going beyond the scope of redirect.
"THE COURT: Sustained.
"Q. Your Honor, it goes to possible bias of the witness.
"THE COURT: I'll sustain the objection.
"Q. Mr. Everitt, you would like very much to see someone convicted of his murder, wouldn't you?
"[PROSECUTOR]: Objection, Your Honor, beyond the scope of direct.
"[COUNSEL]: Bias.
"THE COURT: Sustained. It is beyond the scope."

The Confrontation Clause of the Sixth Amendment affords the accused of the right to cross-examination. *State v. Humphrey*, 252 Kan. 6, 17, 845 P.2d 592 (1992). The exposure of a witness' mo-

tivation in testifying is a proper and important function of cross-examination. *Davis v. Alaska*, 415 U.S. 308, 316-17, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974); *State v. Davis*, 256 Kan. 1, 15-16, 883 P.2d 735 (1994); *State v. Bowen*, 254 Kan. 618, Syl. ¶ 6, 867 P.2d 1024 (1994). A witness can be questioned about possible bias and motivation for testifying regardless of the scope of the direct examination. Failure to allow a party to cross-examine a witness about possible bias or motivation for testifying is error. *Davis*, 415 U.S. at 308. However, the error may be harmless and does not automatically require reversal. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986); *State v. Rinck*, 256 Kan. 848, 854, 888 P.2d 845 (1995); *State v. Gadelkarim*, 256 Kan. 671, 683, 887 P.2d 88 (1994).

Several factors are considered by an appellate court when determining whether a trial court's refusal to allow cross-examination about possible bias or motivation for testifying was harmless, including: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of the cross- examination otherwise permitted; and (5) the overall strength of the prosecution's case. *Delaware*, 475 U.S. at 684; *Davis*, 256 Kan. at 16.

The trial court should have allowed Jacques to continue to question David Everitt about his possible bias and motivation for testifying. David's testimony, which may have revealed bias and motivation for testifying for the State, was not proffered to the court. As the brother of the victim in this case, however, his bias is obvious. David was allowed to testify that he and Everitt were close and that he was "pretty upset" when Everitt died. David further testified that he would like to see someone convicted for the death of Everitt. David testified that a knife was found in Everitt's truck. David testified that Everitt and Jacques had been buying cocaine when Everitt was stabbed. David further testified that Jacques possessed cocaine on March 1. What more he would have testified to regarding his bias and motivation to testify is unknown. The jury

was well aware that David was Everitt's brother and would be biased against Jacques.

Given that (1) David's testimony was not central to the State's case, (2) David's testimony was cumulative with other testimony in the case, and (3) the overall strength of the prosecution's case, we hold that the error was harmless and had little, if any, likelihood of changing the result at trial.

## III. MOTION TO SUPPRESS STATEMENT

Prior to trial, Jacques filed a motion to suppress statements he made to officers concerning his involvement in the death of Everitt. After a hearing, the trial court denied the motion. The court stated:

"After hearing all the evidence I will find that the initial interview statements obtained from the defendant were not the product of custodial interrogation. As soon as the focus of the interrogation centered upon the defendant, he was properly fully advised of his rights pursuant to *Miranda*. That he made a knowing, intentional understanding waiver of those rights.

"The other interview which occurred, I will make those same findings in regard to the *Miranda* rights. I will overrule the motion at this time."

During trial, Jacques contemporaneously objected to the introduction of the statements in order to preserve the issue for appeal. Jacques argues that the trial court erred when it denied his motion to suppress statements he made to the police.

The prosecution has the burden of proving whether a confession or admission is admissible. K.S.A. 22-3215(4). On appeal, an appellate court will not reverse a determination that a confession was freely, voluntarily, and intelligently given if there is "substantial competent evidence" to support the determination. *State v. Fritschen*, 247 Kan. 592, Syl. ¶ 3, 802 P.2d 558 (1990); *State v. Alexander*, 240 Kan. 273, 282, 729 P.2d 1126 (1986); *State v. Waugh*, 238 Kan. 537, 541, 712 P.2d 1243 (1986). The legal conclusion drawn from those facts is reviewed de novo. *State v. Dang*, 267 Kan. 198, 199, 978 P.2d 277 (1999).

Substantial evidence is evidence that possesses both relevance and substance and furnishes a substantial basis of fact from which the issues can reasonably be resolved. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as

being sufficient to support a conclusion. *State v. Grissom*, 251 Kan. 851, 907, 840 P.2d 1142 (1992).

Jacques talked with officers on two separate occasions. In the early morning of March 2, Officer Carl Hill and Detective Gouge found Jacques on the porch of a friend's house. Hill and Gouge asked Jacques to come to the station to speak with them. Jacques went with them in a police car as he did not have a car. Jacques did not hesitate to go to the station. Officers testified that Jacques was searched prior to getting in the police car, but was not restrained in any way. Jacques testified, on the other hand, that he was handcuffed on the porch and was also handcuffed in the interview room. Detectives Jesse Hill and Charles Newman conducted the first interview at about 2:30 a.m. Jacques was asked questions about his identification and other basic information. Officers did not suspect Jacques of killing Everitt at the time but did want to question him as a possible witness. Jacques was free to leave the station at all times. Officers testified at the suppression hearing that it was normal for them to bring witnesses to the city building for questioning during a homicide investigation. Officers testified that Jacques was not restrained in any way. Jacques was nervous and fidgety and appeared to be under the influence of some type of alcohol or drug. Officers felt that Jacques understood what he was saying, however, as he appeared to be alert and coherent. Jacques told officers that he had taken 1 gram of "crank" at 4 p.m., 20 milligrams of morphine at 10 p.m., and 2 grams of cocaine at 10 p.m. the night before. Jacques told officers that the drugs did not affect his ability to speak with them. Jacques' mother picked him up after the first interview was completed.

The tape recording of the first interview was admitted into evidence, despite a timely objection by Jacques. Jacques does not specifically indicate in his briefs, however, which statements from the first interview should have been suppressed or which statements were prejudicial to him. Jacques has a duty to designate the portions of the record which are at the center of the controversy. See *State v. Valdez*, 266 Kan. 774, 792, 977 P.2d 242 (1999) (refusing to consider argument where defendant argued that his *Miranda* rights were violated but where he failed to designate in the

record which specific statements were being contested); *State v. Moncla,* 262 Kan. 58, 68, 936 P.2d 727 (1997) (appellant has the burden of designating in the record where the prejudicial error occurred).

Officers went to Jacques' house at about 2:35 p.m. to talk to him a second time. Again, they took Jacques to the station. This time Jacques was considered a suspect and was handcuffed to the interview table. Detective Morris and Officer Mumma conducted the second interview. Jacques was read his *Miranda* rights at the beginning of the second interview. Jacques also signed a *Miranda* form indicating that he agreed to speak with the detectives. Jacques indicated that he was not under the influence of alcohol or drugs and that he did not have any head injuries which would affect his thinking. Officers observed blood on Jacques' clothing. During the second interview, Jacques admitted he had stabbed Everitt but told officers it had been in self-defense. A thorough review of the record indicates that officers did not coerce Jacques into admitting he stabbed Everitt, nor did they promise anything to him or induce him into talking. Jacques was coherent and answered questions appropriately. Jacques was nervous and cried several times during the interview. Again, Jacques failed to point to any specific statements made during the second interview which may have prejudiced him, although the prejudicial statements are obvious. During the second interview, Jacques admitted to stabbing Everitt, although he claimed it was in self-defense. Jacques further admitted that he had been using drugs for many years and functioned on an everyday basis while using drugs. He also admitted that he had been arrested before and had prior contact with the police as little as 2 weeks before the stabbing. Jacques told officers that he knew what a *Miranda* form was and that he had been interviewed by officers in an interview room and handcuffed to a table on a previous occasion years before.

The first question in an analysis of the right to remain silent is whether the individual was subjected to a "custodial interrogation" or whether it was merely an "investigatory interrogation." *Valdez,* 266 Kan. at 791; *State v. Ninci,* 262 Kan. 21, 34-36, 936 P.2d 1364 (1997); *State v. Lewis,* 258 Kan. 24, 35, 899 P.2d 1027 (1995).

"*Miranda* warnings are not required for noncustodial questioning; they are required for custodial questioning." *Dang*, 267 Kan. at 204. An objective standard is used to judge whether an interrogation is "custodial." The proper analysis is how a reasonable person in the suspect's position would have understood the situation. *Fritschen*, 247 Kan. 592, Syl. ¶ 2. A "custodial interrogation" is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. *State v. Benoit*, 21 Kan. App. 2d 184, 189, 898 P.2d 653 (1995) (quoting *Miranda*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602 [1966]). An "investigatory interrogation," on the other hand, is the questioning of a person by a law enforcement officer in a routine manner in an investigation that has not reached the accusatory stage and where such person is not in legal custody or deprived of his or her freedom in any significant way. *State v. Jones*, 246 Kan. 214, 216, 787 P.2d 726 (1990).

Whether the person interrogated was in custody is determined by looking at the following factors: (1) when and where the interrogation occurred; (2) how long it lasted; (3) how many police officers were present; (4) what the officers and the defendant said and did; (5) the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door; (6) whether the defendant is being questioned as a suspect or as a witness; (7) how the defendant got to the place of questioning, that is, whether he came completely on his own in response to a police request or was escorted by police officers; and (8) what happened after the interrogation — whether the defendant left freely, was detained, or was arrested. The importance of each factor varies from case to case. *Fritschen*, 247 Kan. at 603.

The findings of the trial court that the first interview at the police station was noncustodial were based on substantial competent evidence. Evaluating the factors listed in *Fritschen*, we note that (1) although Jacques testified he was handcuffed during the first interview, officers testified Jacques was never handcuffed and that he was free to go at any time; (2) the interview took place at the

police station in an interrogation room; (3) officers drove Jacques to the station; (4) Jacques left freely with his mother when the interview was complete; (5) the length of the interview was about 2½ hours; and (6) officers testified that Jacques was not a suspect when interviewed the first time and that he was merely being questioned as a possible witness.

We hold that the first interview was merely an investigatory interrogation and was not custodial. There is substantial evidence to support the trial court's conclusion that a reasonable person would have felt free to leave under the same circumstances. Thus, Jacques was not in custody during the first interview. Failure of the officers to provide Jacques with *Miranda* warnings during the first part of his first interview does not require suppression of his statements taken during the interview.

Because the first interrogation, prior to the reading of the *Miranda* rights, was not custodial but merely investigatory, it was admissible at trial and did not taint any of the statements made by Jacques after his *Miranda* rights were read at the first interview or any of the statements made by Jacques at his second interview where he was read his *Miranda* rights from the start. See *Oregon v. Elstad*, 470 U.S. 298, 305-09, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985) (refusing to apply the "fruit of the poisonous tree" doctrine and holding that a noncoercive *Miranda* violation does not automatically taint post-*Miranda* statements); *State v. McCorkendale*, 267 Kan. 263, 270-71, 979 P.2d 1239 (1999) (referring to *Elstad* and holding that "fruit of the poisonous tree" doctrine did not apply to require suppression of post-*Miranda* statements where defendant had made pre-*Miranda* statements); *Dang*, 267 Kan. at 205-06) (applying *Elstad* and holding that post-*Miranda* statements were not tainted by pre-*Miranda* admissions by the defendant); *Ninci*, 262 Kan. at 38 (failure to read *Miranda* rights during noncustodial interrogation does not taint subsequent admissions where *Miranda* rights are read).

Jacques next argues that he did not voluntarily waive his *Miranda* rights during either of the interviews as he was under the influence of drugs.

When determining the voluntariness of a statement, the court must view the totality of the circumstances. *Lewis*, 258 Kan. 24, Syl. ¶ 4. In doing so, the court should evaluate: (1) the manner and duration of the questioning; (2) the suspect's ability upon request to communicate with the outside world; (3) the suspect's intellect, age, and background; and (4) the fairness of the interrogating officers. *State v. Graham*, 247 Kan. 388, 395, 799 P.2d 1003 (1990); *State v. White*, 246 Kan. 28, 32, 785 P.2d 950 (1990); *State v. Waugh*, 238 Kan. 537, 541, 712 P.2d 1243 (1986). Where there is a genuine conflict in the evidence, great reliance must be placed upon the finder of fact. *Andrews v. Hand*, 190 Kan. 109, 117, 372 P.2d 559 (1962).

Jacques' use of drugs prior to being questioned does not automatically require the trial court to suppress any statements he made during the investigation. See *McCorkendale*, 267 Kan. at 271 (holding that trial court correctly refused to suppress statements made by defendant, although defendant claimed he was under the influence of alcohol when they were made, as defendant appeared "coherent" when speaking with officers, understood his *Miranda* rights, rationally responded to questions by officers and did not have slurred speech); *State v. Young*, 220 Kan. 541, 548, 552 P.2d 905 (1976) (affirming trial court's refusal to suppress confession of defendant who told police he was under the influence of drugs during questioning where the testimony showed defendant's mental faculties were sufficient to make a voluntary confession); *State v. Harden*, 206 Kan. 365, 368-72, 480 P.2d 53 (1971) (affirming second-degree murder conviction and holding that defendant's use of alcohol did not require suppression of statement as defendant appeared rational, gave answers which were very "precise," and appeared "normal"); *State v. Kimmel*, 202 Kan. 303, 307-08, 448 P.2d 19 (1968) (affirming trial court's decision not to suppress statement made by defendant even though defendant claimed he was intoxicated at the time he waived his *Miranda* rights); *State v. Baker*, 4 Kan. App. 2d 340, 343, 606 P.2d 120 (1980) (reversing trial court's granting of defendant's motion to suppress and holding that defendant's use of drugs and alcohol prior to questioning did

not automatically require suppression of confession he made to officers).

We find there is substantial competent evidence to support the trial court's determination that Jacques' incriminating statements were freely, voluntarily, and intelligently given. Jacques was able to answer questions in a coherent manner, follow the conversation, understand what was being asked of him, had experience with the *Miranda* form, and had been questioned by the police on a previous occasion. Additionally, Jacques denied being under the influence of either drugs or alcohol during the second interview. The trial court correctly denied Jacques' motion to suppress.

## IV. CONVICTION FOR FELONY MURDER

Jacques argues that there was insufficient evidence to support the underlying felony (possession of cocaine) which was used to convict him of felony murder.

Jacques admits that Everitt had gone to Rogers' house to purchase cocaine. Jacques argues, however, that when Everitt came out of the house yelling and screaming at Jacques, the act of purchasing the cocaine ended. Jacques admits, however, that he purchased cocaine shortly after stabbing Everitt. Because the stabbing occurred after Everitt left the house and before Jacques went back in to purchase the drug, Jacques argues that the felony-murder rule cannot be applied, as he did not possess cocaine at the same time that he stabbed Everitt and did not have any intent to possess cocaine at the time. Indeed, the usual circumstance in which the felony-murder rule is applied is either where the felony is being committed and a death results, or where the felony has been completed and a death results shortly thereafter as a result of the defendant fleeing the scene.

When applying the felony-murder rule, however, the felony and the victim's death do not need to occur simultaneously, nor does the felony need to occur *before* the death. Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony and therefore subject to the felony-murder

rule. *State v. Shaw*, 260 Kan. 396, Syl.¶ 1, 921 P.2d 779 (1996); *State v. Lashley*, 233 Kan. 620, 631, 664 P.2d 1358 (1983).

We hold that the death need not occur during or after the commission of the felony to support a conviction for felony murder. The question for the jury is whether the death is within the res gestae of the crime, regardless of the actual sequence of events. See *People v. Jones*, 86 Ill. App. 3d 253, 256-57, 408 N.E.2d 79 (1980) (noting that the felony need not occur before the death but may occur after the death to support a conviction for felony murder); *People v. Goddard*, 135 Mich. App. 128, 135, 352 N.W.2d 367 (1984) (noting that for felony murder, there must be "causal connection" between the felony and the death but that the death may "take place sometime before or after" the felony); *State v. Nelson*, 65 N.M. 403, 411, 338 P.2d 301 (1959) (affirming felony-murder conviction where death occurred first and felony second and noting that the sequence of events is "not determinative" but that the felony must occur within the res gestae of the crime); *State v. Handy*, 331 N.C. 515, 529, 419 S.E.2d 545 (1992) (affirming felony- murder conviction even though the defendant may have formed the intent to commit the armed robbery after the death occurred as there was no "break in the chain of events" forming "one continuous transaction"); *Perry v. State*, 853 P.2d 198, 200 (Okla. Crim. 1993) (applying a res gestae analysis to a felony-murder case where the death occurred first and the robbery of the victim occurred second, and holding that defendant could still be charged and convicted of felony murder); and *State v. Kimball*, 14 Wash. App. 951, 957, 546 P.2d 1217 (1976) (holding that defendant could be convicted of felony murder even if the felony occurs after the death as long as there is some "connection" between the two crimes).

In the present case, Jacques went with Everitt to purchase cocaine. Although Jacques was dropped off at a grocery store and did not immediately go to the house where Everitt was to buy the cocaine, Jacques eventually walked to the house. The attempt by Everitt to purchase cocaine, the stabbing of Everitt, and the subsequent purchase of the cocaine by Jacques were part of one continuous transaction. Jacques had the opportunity to take Everitt to

the hospital but chose to go back inside and complete the cocaine transaction instead.

A review of all of the evidence, when viewed in a light most favorable to the prosecution, shows that a rational factfinder could have found Jacques guilty of felony murder beyond a reasonable doubt. A rational factfinder could have concluded that the stabbing was within the res gestae of the possession of cocaine. Thus, there was sufficient evidence to support the conviction of Jacques for felony murder.

## V. JURISDICTION

Jacques argues that because the second amended complaint was not signed by the county attorney, attorney general, or a legally appointed assistant or deputy to either, the trial court had no jurisdiction over his case.

Whether a court has jurisdiction over a matter is a question of law over which this court has unlimited review. *Dickerson v. Kansas Dept. of Revenue*, 253 Kan. 843, 844, 863 P.2d 364 (1993); *Gillespie v. Seymour*, 250 Kan. 123, Syl. ¶ 2, 823 P.2d 782 (1991).

On March 4, 1998, the State filed a complaint charging Jacques with first-degree felony murder and possession of cocaine for the crimes committed on March 1, 1998. On March 25, 1998, the State filed an amended complaint adding count three (possession of cocaine) and count four (misdemeanor battery) for the events which occurred on February 19, 1998. The amended complaint alleged that counts three and four also occurred on March 1, 1998. Both the original complaint and the first amended complaint bear the signature of the complaining witness as well as the sworn signature of the assistant district attorney before a judge of the district court.

The preliminary hearing was held on March 31, 1998. At the hearing, the State moved to amend the date on counts three and four of the first amended complaint to reflect that the crimes had been committed on February 19, 1998, instead of March 1, 1998. The State noted that Jacques had been provided with copies of the reports for those crimes. The State asked that the court amend the first amended complaint by interlineation in court so that the preliminary hearing could proceed. Jacques did not object. The district

court amended the complaint by interlineation and accepted a copy provided by the State for the purposes of filing without objection. The second amended complaint bears a stamp indicating that it was filed on March 31, 1998, but was not signed by the assistant district attorney or any authorized attorney.

Jacques argues that the district court's jurisdiction is based upon the filing of a valid complaint and that because the second amended complaint was never signed, the district court lacked subject matter jurisdiction over him. Jacques' argument centers on the language in K.S.A. 1999 Supp. 22-3201(b), which requires the complaint to be signed by the county attorney, attorney general, or a legally appointed assistant or deputy to either.

The district court, however, had subject matter jurisdiction over Jacques when the original complaint was signed. Jurisdiction over Jacques did not "vanish" upon the filing of the first amended complaint, nor did it "disappear" upon the filing of the second amended complaint at the preliminary hearing on March 31, 1998.

The purpose of the second amended complaint was to change the date that counts three and four were committed. Jacques was not charged with any different crimes or prejudiced in any way by the change in date. The State may orally amend a complaint at any time prior to the verdict if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced. K.S.A. 1999 Supp. 22-3201; *State v. Rasch*, 243 Kan. 495, 499, 758 P.2d 214 (1988). The failure by the State to file an amended complaint after making an oral motion to do so does not deprive a trial court of subject matter jurisdiction over a defendant. See *State v. Switzer*, 244 Kan. 449, 457, 769 P.2d 645 (1989) (holding that failure to properly memorialize an oral motion to amend the information is not, in itself, prejudicial to the defendant and does not constitute reversible error); *State v. Nunn*, 244 Kan. 207, Syl. ¶ 18, 768 P.2d 268 (1989) (holding that an oral amendment is effective, absent prejudice to the defendant, even where the prosecution failed to memorialize the amendment in a journal entry until after the trial); *State v. Dodd*, 11 Kan. App. 2d 513, 515, 728 P.2d 402 (1986)(holding that failure to file an amended information in writing is not reversible error and that an oral amendment does

not result in a defendant being found guilty of a crime that he was not charged with).

The State's oral amendment at the preliminary hearing to correct the dates on counts three and four did not prejudice Jacques. Jacques had notice of the crimes charged against him and had the opportunity to defend himself in a court of law. Indeed, Jacques was found not guilty on count four. The trial court had jurisdiction over Jacques.

## VI. CONSOLIDATING THE CHARGES

Jacques argues that the trial court erred when it consolidated the charges stemming from the February 19, 1998, incidents (possession of cocaine and misdemeanor battery) and the charges stemming from the March 1, 1998, incidents (felony murder and possession of cocaine).

A trial court's decision to consolidate charges for trial will not be disturbed on appeal unless there is a clear showing of abuse of discretion. If reasonable people could differ about the propriety of the trial court's decision, the appellate court will not find an abuse of discretion. *State v. Cromwell*, 253 Kan. 495, 511, 856 P.2d 1299 (1993); *State v. Woods*, 250 Kan. 109, 117, 825 P.2d 514, *cert. denied* 506 U.S. 850 (1992).

Charges may be joined if (1) the crimes are the same or similar in character; (2) the crimes arise from the same transaction; or (3) the crimes constitute parts of a common scheme. K.S.A. 22-3202(1); *State v. Crawford*, 255 Kan. 47, 53, 872 P.2d 293 (1994).

Jacques never objected when the charges were consolidated, nor did he object when they were amended prior to trial at the preliminary hearing. No motion to sever was ever filed by Jacques, nor is there any record of an objection at trial. Jacques' failure to object to the consolidation of the February 19 and March 1, 1998, charges deprives this court of the ability to review the alleged error. See *State v. Alderson*, 260 Kan. 445, Syl. ¶ 7, 922 P.2d 435 (1996); *State v. Solomon*, 257 Kan. 212, 222, 891 P.2d 407 (1995).

Affirmed.